**Delores FRANKLIN, Individually and as Natural Mother of Ronald Earl Walker, Deceased, and on and for the Behalf of Ronald Earl Walker, Deceased, Plaintiff,**

v.

**The CITY OF BOISE, Michael Paul Konst, Ted Littlefield, Angela Louise Bevier and John Does I Through VIII, Defendants.**

**Civ. No. 91–0218.**

United States District Court, D. Idaho.

Nov. 6, 1992.

---

Reed W. Larsen, Racine Olson Nye Cooper & Budge, Pocatello, Idaho, for plaintiff.

Michael W. Moore, Paige A. Parker, Imhoff & Lynch, Boise, Idaho, for defendants.

## MEMORANDUM DECISION

CALLISTER, Senior District Judge.

The Court has before it defendants' motion for summary judgment and motion to strike affidavit of expert. The Court heard oral argument on these motions and they are now at issue. On the motion for summary judgment the Court must determine whether there exist any genuine issues of material fact. Fed.R.Civ.P. 56(c).

This litigation began when Ronald Walker drowned in a dredge pond after a struggle with Boise City police officers. Walker's mother, Delores Franklin, has brought this action for damages against the three individual police officers involved in the altercation, and the City of Boise. Her main claims are that the police used excessive force, botched rescue attempts, and discriminated against Walker because he was an African–American. A thorough understanding of the facts is necessary to resolve these claims.

In the early morning hours of August 15, 1990, an apartment tenant called the Boise City Police to complain of loud music coming from the dredge pond a short distance away. The police dispatcher directed Officer Angela Bevier to respond at 1:26 a.m. Officers Bevier and Littlefield obtained a signed complaint from the tenant, and proceeded to the dredge pond. At this time Acting Field Commander Michael Konst was waiting near an entry road to the dredge pond. When Officer Konst saw a pickup truck leave from the dredge pond area, he was concerned that the noise perpetrators might flee. He decided not to wait any longer for officers Littlefield and Bevier, but to go to the pond immediately. He did so, and upon arriving found five vehicles and about ten to twelve individuals. Officer Konst testified that upon his arrival, "somebody had a stereo turned up pretty loud." Deposition of Konst at pp. 34–35.

Plaintiff has argued in her brief that All three officers went to the Park Center dredge pond. Upon their arrival, there was no loud music or excessive noise.... Officer Konst observed a pickup truck leaving the Park Center dredge pond prior to all three officers arriving. Given the fact that the excessive noise had ceased by the time the officers arrived, it is only logical to con-

clude that the vehicle that left the pond was the major source of the complained noise.

*See* Plaintiff's Brief filed June 3, 1992, at p. 4.

This argument completely ignores the undisputed testimony that Officer Konst arrived first at the dredge pond and heard loud music. While it is true that by the time Officers Bevier and Littlefield arrived at the dredge pond the music had ceased, this does nothing to advance plaintiff's argument in light of Officer Konst's testimony that there was loud music when he arrived there. Even if the pickup truck that left earlier was a source of the loud music, it was obviously not the only source.

Officer Konst waited in his car for the other officers. When they arrived, all the officers exited their cars to investigate the loud noise complaint. Officer Konst first approached two individuals—Mike Randall and Kevin Anderson—who were drinking beer and sitting on the tailgate of a white pickup truck. These two individuals were both Caucasians. Because these two men appeared to be of age and not the source of the loud music, Officer Konst proceeded to the next car. *See* Deposition of Konst at pp. 35–37.

There, he found Dagmar Danney, a white female who owned the car, seated in the driver's seat, with Ronald Walker seated in the passenger seat. Officer Konst asked for identification, and Danney produced her driver's license. Although Walker had no license, he gave Officer Konst his name, birthdate, and Social Security number. Officer Konst told Danney and Walker to stay put while he investigated the information they had given him. Dagmar Danney testified that as Officer Konst was taking this identification information back to his patrol car to run a warrant check, she heard him say, "These f——— kids and their f——— music." Deposition of Danney at pp. 96–97. Officer Konst denies this use of profanity. Officer Konst then called the dispatch center and requested a check on whether there were any outstanding warrants on Danney and Walker. At 1:50 a.m. Officer Konst was informed that Dan-

ney's record was clear but that there was a possible arrest warrant on Walker. Officer Konst requested confirmation and then proceeded to investigate a suspicious-acting individual near a copper-colored pickup truck. Officer Konst determined that this individual was a Michael Hendrikse, obtained information from him, and ran a check on him through police dispatch.

Meanwhile, Officers Bevier and Littlefield were questioning the main group of young people to investigate the source of the loud noise and to determine if any underage drinking was going on. Officer Littlefield wrote an under-age drinking citation to Michelean Wilson and was in the process of writing one to Cecelia DeCosta when he ran out of citation forms. Officer Littlefield then approached Officer Konst to obtain more forms, whereupon Officer Konst informed Officer Littlefield about the possibility that an arrest warrant was outstanding on Walker. Officer Konst—as Field Commander—instructed Littlefield to finish writing citations and then to begin instructing the youth to leave so that there would be less obstruction from bystanders if Walker had to be arrested. Officer Littlefield agreed and went off to finish writing a citation to Cecelia DeCosta.

At about this time, Officer Konst noticed that Randall and Anderson, who had been drinking beer on the tailgate of the white pickup truck, were missing. Looking around, he saw that the two men were in the pond swimming away from the scene. He yelled at them to return; Mike Randall complied but Kevin Anderson did not. Anderson continued to swim away and eventually escaped.

Officer Konst then instructed Mike Randall to stay put until he could return to him. About this time, 1:53 a.m., police dispatch called Officer Konst with the results of its record check on Hendrikse and also confirmed the outstanding arrest warrant on Walker. Dispatch told Officer Konst that Hendrikse was clear, but confirmed that there was a day-night misdemeanor warrant on Walker for a failure to appear with bond set at $250.00. Then, at 1:56 a.m., Officer Konst called dispatch to

run a records check on Mike Randall, which turned up nothing.

At this time, Officer Bevier was telling the congregated youth to leave. Dagmar Danney testified that she heard Officer Konst shout, "Get those f—— cars out of here." Deposition of Danney at pp. 45–47. Officer Konst denies this use of profanity.

Officer Bevier, not knowing about the outstanding warrant on Walker, then instructed Walker that he should leave with a friend. *See* Deposition of Bevier at p. 61. Walker complied by exiting the Danney vehicle. When Officer Konst saw Walker leaving, he told Walker to get back in the Danney car, and Walker complied. Officer Konst denies using any profanity here, but Danney testified that he directed Walker to "Get back in the f—— car, you son-of-a-bitch." *See* Deposition of Danney at pp. 91–92.

Officer Konst then informed Officer Bevier about the warrant on Walker. About this time, Walker re-emerged from the car and walked toward Officer Konst. There is no indication in the testimony that Walker was fleeing at this time; instead, it appears that he was approaching Officer Konst to find out why he (Walker) could not leave with all the others. Deposition of Konst at p. 57.[1]

At this time, Officer Konst told Walker that there was a warrant outstanding for Walker's arrest, and that Walker should turn around and put his hands behind his back. Dagmar Danney testified that Officer Konst yelled at Walker in an angry tone of voice. Deposition of Danney at p. 100. When Officer Konst reached out to grab Walker in an attempt to handcuff him, Walker fled, running toward the dredge pond. Officer Konst caught Walker from behind and pulled him to the ground. Officer Bevier attempted to secure Walker's hands so that the handcuffs could be applied. But Walker broke free and again ran off with Officers Konst and

Bevier in pursuit. For a second time, Officer Konst pulled Walker to the ground although Walker again escaped. Dagmar Danney testified that during this struggle she saw Officer Konst strike Walker on a single occasion in the face with his fist. Officer Konst denies this.

These struggles had brought the parties to the ledge of an embankment that led down about six feet to the edge of the dredge pond. Officers Konst and Bevier and Walker lost their footing at the top of this embankment and tumbled down to the water's edge. Walker once again broke free from the grasp of Officer Konst, but Officer Bevier was still holding on. Walker dragged her for a ways as he ran along the water's edge. Officer Bevier then let go just as Officer Konst grabbed Walker around the waist. As the men struggled, they entered the dredge pond up to their knees. Officer Konst had not been in the pond prior to this night and did not know the depth of the water. The floor of the dredge pond drops off sharply, and although these two men began their struggle in knee-deep water, they were moving toward the drop-off that would leave them both unable to touch the bottom.

As they struggled, Officer Konst put a bear-hug around Walker by wrapping his arms around Walker in an attempt to pin Walker's arms to his sides. But about this point, the men lost their balance, toppling over and out into the deep part of the pond. Officer Konst quickly discovered that he could not touch the bottom, and he thought to himself:

This isn't worth it, in my mind, only thought process anyway, this isn't worth it, I'm awfully tired you know, I'm not going to drown out here over a misdemeanor warrant. And I pushed myself away from Mr. Walker to make it clear to him that he was free to go and I didn't want anything to do with him at that point.

Deposition of Konst at pp. 84–85.

Officer Konst surfaced, and he saw Walker surface. Officer Konst then swam

---

1. At least two other witnesses, Mori Bagby and Michael Randall, testified that Walker did not leave his car, and that Officer Konst came up to the vehicle, told Walker to exit, and then told

Walker he was under arrest. *See* Deposition of Bagby at p. 63; Deposition of Randall at pp. 29–30. This difference in the testimony is insignificant for purposes of this summary judgment.

for shore. When he reached a point where he could stand, he looked back and saw Walker sinking below the surface. One witness says she saw Officer Konst at this point with his nightstick in his hand, although she never saw him use it. *See* Deposition of DeCosta at pp. 54–55, 85–86. Officer Konst then proceeded to shore where he removed his duty belt and shoes. He instructed Officer Bevier to move the patrol cars to the embankment where the headlights could illuminate the site, and he and Officer Littlefield started diving to find Walker. Officer Bevier called in a "Code 3" to the dispatcher, meaning that all available units should respond as quickly as possible. She also called the paramedics. Although unknown by the officers at this time, it appears that Walker could not swim.

As Officers Konst and Littlefield were diving, they were joined by Michael Randall. Randall wanted to assist the officers in rescuing Walker, and stated that he knew cardiac pulmonary resuscitation. Although Randall said that he had only had one and one-half beers that evening, the officers felt that he was highly intoxicated because they had seen him earlier sitting on a tailgate of a pickup truck drinking beer with numerous empty beer cans at his feet. At one point, the officers observed that Randall was having difficulty in the water and so Officer Konst ordered Randall to the shore and prohibited him from any further rescue attempts.

At 2:02 a.m. the Boise Fire Department dive team was requested, and they arrived at 2:09 a.m. The dive team dove for an hour but could not locate Walker. When efforts were continued the next day, the dive team did locate Walker's body at about 11:30 a.m.

An autopsy was conducted, and the Ada County Coroner, Erwin L. Sonnenberg, concluded that Walker died "by fresh water drowning and that no physical violence was a direct cause of Mr. Walker's death." *See* Affidavit of Sonnenberg filed April 24, 1992, at p. 5. The coroner further concluded as follows:

7. Based upon my review of the Tucker Coroner's Report (Exhibit "A") and Dr. Keen's report (Exhibit "B") and upon my own observations, knowledge and experience, I conclude the following:

(a) That the multiple small abrasions appearing around Mr. Walker's right eye along with the multiple small scratches and abrasions on Mr. Walker's face appear to be post-mortem and most likely caused by fish;

(b) That the multiple small abrasions around Mr. Walker's right shoulder appear to be post-mortem;

(c) In addition, Mr. Walker appears to have a number of other small abrasions and/or pock marks under the corner of his right eye, his lower left lip, lower left neck at the shoulder, lower left arm, upper right arm, above and below the left knee, and below the right knee.

8. All of the abrasions described in paragraph 7 were superficial in nature.

The coroner further testified that the autopsy revealed that Mr. Walker had a blood alcohol level of .185. *See* Affidavit of Sonnenberg, *supra*, at p. 4, ¶ 9. In addition, a blood analysis revealed traces of cocaine. *Id.*

Walker's mother has filed this action under 42 U.S.C. §§ 1983 and 1985 seeking damages for her son's death. Her complaint can be divided roughly into claims for excessive force and claims for inadequate rescue. She summarizes her constitutional claims as follows:

The plaintiff alleges violations of Ronald Walker's rights under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

One, the arrest constituted an unreasonable seizure and violation of Ronald Walker's Fourth Amendment rights, as incorporated by the Fourteenth Amendment, which unreasonable seizure resulted in Ronald Walker's death.

Two, the actions of the defendants in carrying Ronald Walker to a place of danger and leaving him there to drown, refusing and failing to rescue him, and preventing others from attempting to

rescue him, deprived Ronald Walker of his life in violation of his rights to due process under the Fifth and Fourteenth Amendments.

Three, the actions of the defendants in singling Ronald Walker out for arrest and abusive treatment denied him the equal protection of the law, in violation of the Fourteenth Amendment.

Furthermore, the plaintiff alleges these acts were carried out in furtherance of the defendant City's policies, and/or custom, and were the direct and proximate result of the City's failure to properly train its police officers.

*See* Plaintiff's Memorandum filed May 26, 1992, at pp. 20–21.

■ The Court will turn first to plaintiff's claim under the Fourth Amendment that the police officers used excessive force in attempting to seize Ronald Walker thereby causing his death. To determine whether police use excessive force, courts must carefully balance the nature and quality of the intrusion against the governmental interest at stake. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Such a balancing "requires careful attention to the facts and circumstances of each particular case including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* The question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them. *Id.* This objective reasonableness is judged not by 20–20 hindsight, but instead from the perspective of a reasonable officer on the scene. *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Whether the amount of force used was reasonable is usually a question of fact to

be determined by the jury. *Barlow v. Ground*, 943 F.2d 1132 (9th Cir.1991).

This Circuit has held that summary judgment was inappropriate—and a jury question presented—when a gay rights marcher was placed in an "extremely punishing pain compliance hold" by police solely for bumping accidentally into a placard held by an anti-gay rights demonstrator. *Id.* at 1136. In another Ninth Circuit case, a jury question was presented when a middle-aged housewife was handcuffed roughly enough to leave bruises and require medical treatment all because she might have hindered a search by police through her garbage cans. *Hansen v. Black*, 885 F.2d 642 (9th Cir. 1989). In neither of these cases did the arrestee vigorously resist arrest and attempt to flee as Walker did.

When faced with circumstances closer to our own, the Ninth Circuit ruled, as a matter of law, that excessive force was used. In *Eberle v. City of Anaheim*, 901 F.2d 814 (9th Cir.1990) the police were called to control a fan at a football game. The fan had caused a near-brawl, and his friends were actively resisting arrest. A large crowd had gathered, and the situation was ugly. The police applied an index finger control hold on the fan and used the hold to move him to a safe area. The Ninth Circuit found no excessive force under these circumstances, stressing the potential for violence and the resistance of the fan's friends. *Id.* at 820.[2]

In similar cases, and even in cases where the arrest has resulted in more serious injury to the arrestee, summary judgment has been granted to the police when the plaintiff was resisting arrest and the force was objectively reasonable. *Foster v. Metropolitan Airport's Comm'n*, 914 F.2d 1076 (8th Cir.1990); *Brooks v. Pembroke City Jail*, 722 F.Supp. 1294 (E.D.N.C.1989); *Damron v. Pfannes*, 785 F.Supp. 644 (E.D.Mich.1992); *Stevens v. Stover*, 727 F.Supp. 668 (D.D.C.1990). It is thus apparent that not every excessive force claim

---

2. The Circuit found that a jury verdict for the police officers was based on an incorrect instruction and would have to be reversed unless the Circuit could find as a matter of law that there was no excessive force. The Circuit did make that finding as a matter of law. *Id.* at 820.

must be presented to the jury. There are circumstances where the evidence is so clear that summary judgment is warranted. This is such a case.

The Supreme Court has made it clear that "the right to make an arrest ... necessarily carries with it the right to use some degree of physical coercion or threat to effect it." *Graham, supra,* 490 U.S. at 396, 109 S.Ct. at 1871. One of the important elements to examine in determining whether the force is reasonable is whether the suspect is fleeing. *Id.* And when an arrestee flees, the police may pursue even if the offense involved is minor. *Galas v. McKee,* 801 F.2d 200, 204 (6th Cir.1986) (arrestee pursued for traffic offense).

Here, there is no doubt that Walker was resisting arrest and attempting to flee. He was pulled to the ground on three different occasions by Officer Konst before the two men found themselves knee-deep in the water. During this entire time, only one witness testified that Officer Konst delivered any blows to Walker, and even then the testimony is only that a single blow was rendered. The lack of fisticuffs is remarkable given the three different occasions that Officer Konst had Walker in his grasp only to see him escape.

Up to the point that the two men entered the water, the officers were persistent, not abusive. They were trying to contain Walker by use of a bear-hug and handcuffs; they were not trying to pummel him into submission. No pain compliance holds or weapons were used. The evidence is undisputed that Walker was a strong, vigorous young man who was able to repeatedly escape the grasp of these two officers. Aside from the single blow, the officers' physical contact with Walker was necessitated entirely by Walker's resistance to the arrest. And the unrebutted coroner's opinion establishes that the physical contact inflicted no injury on Walker's body.

When the physical contact is caused by the arrestee's resistance, leaves no significant abrasions, bruises, or other injuries on the arrestee's body, and is a weaponless attempt to contain and control rather than to abuse or dominate, the Court finds as a matter of law that no excessive force exists.

Thus, up to the time that Walker and Officer Konst were struggling in the knee-deep water, no excessive force had been employed. When the events occurring thereafter are added to all the prior circumstances, does the totality of circumstances raise a question of excessive force? No.

It is undisputed that both Officer Konst and Walker were ignorant that the struggle in the dredge pond had taken them to a point where the pond's bottom dropped off sharply. It is also undisputed that Officer Konst did not intentionally throw Walker into this deep water, but instead that their struggle caused them to fall into it. Plaintiff argues in her briefing that Officer Konst "carried Ronald Walker against his will into water over his head." *See* Plaintiff's Memorandum at pp. 23–24. There is absolutely no evidence in the record to support this allegation. All the evidence establishes that Walker was fleeing initially toward the dredge pond, and that the natural and purely accidental direction of their struggle led these two men into the pond. It is further undisputed that Officer Konst had no way of knowing that Walker—a man who had just overpowered two police officers on three occasions—could not swim. Once in the deep water, Officer Konst broke off contact with Walker and swam away, indicating that the pursuit was over. These events had all happened very quickly, with Officer Konst being forced to make split-second decisions in hot pursuit of a fleeing arrestee.

Plaintiff asserts that Officer Konst "left Ronald Walker to drown." *See* Plaintiff's Memorandum at p. 24. Once again, plaintiff's assertion finds no support in the record. Officers Konst and Littlefield dove repeatedly in attempts to rescue Walker.

The situation would have been very much the same if these two men had been struggling on dry land and Officer Konst's gun had accidentally discharged, killing Walker. That very circumstance occurred in *Dodd v. City of Norwich,* 827 F.2d 1 (2nd Cir.1987), and the Second Circuit

Court of Appeals held that the officer acted reasonably in seizing the suspect, and that the accidental shooting thereafter did not constitute a Fourth Amendment violation. *Id.* at 7.[3]

When all the circumstances of this case are reviewed from the perspective of a reasonable officer at the scene, it is clear as a matter of law that the Boise City police officers did not use excessive force.

■ The Court turns next to plaintiff's due process claim. Here, the plaintiff asserts that the police placed Walker in danger and then failed to rescue him, and prevented Michael Randall from attempting to rescue. In support of this argument, plaintiff cites *DeShaney v. Winnebago County Soc. Serv.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), which held that

> When the state takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.... The rationale for this principle is simple enough: When the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the ... due process clause....
>
> The affirmative duty to protect rises not from the state's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it imposed on his freedom to act on his own behalf.

*Id.* at 199–200, 109 S.Ct. at 1005–06.

Thus, *DeShaney* stands for the proposition that the state is not liable simply because it knows plaintiff is in danger; its liability is only triggered when it has limited the plaintiff's ability to act on his own behalf to avoid a risk.

Did Officers Konst, Bevier and Littlefield limit Walker's ability to act on his own behalf? No. It was Walker who decided to resist arrest. As the court stated in *Tagstrom v. Pottebaum*, 668 F.Supp. 1269, 1273 (N.D.Iowa, 1987), in a slightly different context that is nevertheless applicable here, "[The arrestee] appears to have preferred the risk of injury over the risk of apprehension and suffered the consequences of that choice." Walker fled initially toward the dredge pond. The evidence is clear that Officer Konst never intentionally forced Walker into the water. Walker's resistance, and Officer Konst's persistence, defined the struggle's intensity, but neither man controlled its direction.

These circumstances distinguish this case from *Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989). There, a police officer pulled over a drunk driver whose passenger was Linda Wood. The officer arrested the driver, impounded the car, and stranded Wood at 2:30 a.m. in an area with a very high violent crime rate. Not surprisingly, Wood was shortly thereafter raped. The Ninth Circuit reversed a summary judgment for the police officer, finding serious questions whether, in *DeShaney's* terms, the officer had limited Wood's "freedom to act on [her] own behalf." *Id.* at 200. Linda Wood did not find herself in a perilous situation because she was resisting arrest or fleeing from the police. It was entirely the officer's actions that exposed her to danger.

In the present case, Walker exposed himself to danger by resisting arrest and fleeing. Under *DeShaney*, no duty to protect arises in that situation. But even if a duty to rescue or protect arises, the Court finds that the duty was not breached. Officers Konst and Littlefield dove repeatedly in attempts to find Walker. The Boise Fire Department dive team was called and responded immediately, although not successfully. It is undisputed that these initial rescue attempts occurred in the dark, and that the pond was choked with weeds.

**3.** It is important that a reader of the opinion in *Dodd* understand that the final opinion of the Court, listed at pp. 7–8, overrules the initial opinion found at pp. 1–6.

■ It is no due process violation for an officer to attempt an ineffectual or negligent rescue. *Andrews v. Wilkins*, 934 F.2d 1267 (D.C.Cir.1991). Here, there is every indication that Officers Konst, Littlefield and Bevier expended a great deal of energy to effect a rescue, far surpassing a negligent attempt.

■ Plaintiff argues that the police are liable for prohibiting Mike Randall from participating in the rescue. It does appear that when police deliberately or recklessly interfere with ongoing private rescue efforts, a due process violation may lie. *Ross v. United States*, 910 F.2d 1422 (7th Cir.1990). In *Ross,* a deputy sheriff prohibited trained professionals from diving into the water to save a drowning boy because county policy required the rescuers to be "authorized" fire department divers. By the time the authorized rescuers arrived, the boy was dead. In that case, the deputy sheriff was exposed to liability for acting at least recklessly in enforcing a bureaucratic policy while a boy drowned.

This case is much different. The police stopped Mike Randall because he appeared to be having trouble in the water. Whether Randall was actually drunk or not is irrelevant; it was certainly reasonable for the officers to believe Randall was drunk because he was observed earlier in the morning sitting on a pickup truck tailgate drinking a beer with numerous empty beer cans at his feet. The case is very much like *Andrews v. Wilkins, supra,* where the police stopped a private individual from rescuing a fleeing suspect who was drowning in a canal. The court found that the officers acted reasonably in prohibiting the private rescue efforts out of concern for the private rescuer's safety. *Id.* at 1271. The Boise police had the same reasonable concerns for the safety of Mike Randall, and thus properly restricted him.

■ The Court turns next to plaintiff's equal protection claims. The plaintiff asserts that the defendants conspired to deprive Walker of the equal protection of the laws because he was an African–American. The plaintiff asserts that Walker was sin-gled out for harsh treatment because he was found with a white woman, Dagmar Danney, in Danney's car.

But the "singled-out" theory does not hold up under close examination. Walker was not the only person Officer Konst collected identification information from that night. Officer Konst also collected information identification from Dagmar Danney, Michael Hendrikse, and Michael Randall. And Walker was not the only person that Officer Konst ran a warrant check on through police dispatch. He also ran a warrant check on Danney, Hendrikse, and Randall, all Caucasians. These checks turned up no outstanding warrants. There is some evidence that a white female, Cecelia DeCosta, had an outstanding arrest warrant, and plaintiff complains that she was not pursued with the same vigor as Walker. But the record is clear that none of the officers on the scene were aware of DeCosta's outstanding warrant on the night at issue. In addition, Officer Littlefield was in the process of citing DeCosta for under-age drinking when the Walker incident erupted. This record shows no evidence that the officers singled out Walker because of his skin color.

Even if Officer Konst wanted to focus on Walker, Officer Konst was forced by events that night to splinter his attention between a couple of incidents. Besides running a warrant check on Walker, Officer Konst was investigating the suspicious activity of Hendrikse in ducking behind the door of his pickup. Officer Konst was also investigating the disappearance of Randall and Anderson, and returning Randall to the scene after his attempted escape. Finally, Officer Konst was examining the identifications of other individuals and running the dispatch warrant checks described earlier.

Officers Bevier and Littlefield had nothing to do with Walker until Walker fled. Officers Bevier and Littlefield were trying to identify and then disperse the youth that had congregated some distance from Walker. It was not until Walker chose to resist arrest and flee that the attentions of Officers Bevier and Littlefield were directed toward him.

Plaintiff asserts that Officer Konst directed profanity at Walker. The only witness that heard profanity was Dagmar Danney. Assuming that Danney is telling the truth, as the Court must do in this summary judgment, Officer Konst directed two of his profane statements at the youth and their music in general, not at Walker. On these two occasions, Officer Konst allegedly stated: "These f——— kids and their f——— music," and at another point directed the young people to "Get those f——— cars out of here." Only one profanity was directed to Walker, when he was told by Officer Konst to "Go back in the f——— car, you son-of-a-bitch." It appears Officer Konst was spreading around his epithets according to Danney, and there is no evidence of racial discrimination here.

Once the officers knew that there was an outstanding warrant on Walker, and saw him resist arrest and flee, there can be no serious argument that their pursuit was racially motivated. The Court can find no evidence here indicating an equal protection violation.

■■■■ The Court notes further that for all of the federal constitutional claims, the officers enjoyed good-faith immunity. Public officials have a qualified immunity when they engage in an unconstitutional act where the alleged constitutional violation was not clearly established. *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Hunter v. Bryant*, —— U.S. ——, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991), the Supreme Court stated as follows:

> The qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." ... This accommodation for reasonable error exists because "officials should not err always on the side of caution" because they fear being sued.

*Id.* at ——, 112 S.Ct. at 537 (quoting from *Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

Here, the Court finds that the officers acted at all times commendably. The very most that can be wrung out of this rec-

ord—by someone other than this Court—is that the defendants were guilty of mistaken judgment, but there is no evidence that the officers acted incompetently or that they knowingly violated the law. At the time of this incident there was no clearly established law that prevented Officer Konst from pursuing Walker as he did, tackling him, and eventually struggling with him in the water. It is therefore apparent to the Court that all of the officers are protected by good-faith immunity.

■■■■ The Court turns next to plaintiff's claims against the City of Boise. The plaintiff recognizes that a municipality is only liable when the execution of its policy or custom inflicts injury; it cannot be liable on the theory of respondeat superior. *Monell v. New York Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The plaintiff asserts that Walker's death was caused by the City's failure to train its police officers in race relations and in dealing with bystander rescue attempts of the sort contemplated by Michael Randall. The Court can find no constitutional violation here. The lack of race-relations training is irrelevant when no racial animus caused the injury, and the conduct of the police toward Randall was completely reasonable. The Court can find no evidence supporting the claims against the City.

■■■■ The Court turns next to defendants' motion to strike the affidavit of J.E. Van Lancker. He has filed his affidavit in this matter asserting various opinions as an expert. Under Fed.R.Evid. 702, expert testimony is admissible where it would assist the trier of fact to understand the evidence or to determine a fact in issue, and the witness is qualified by knowledge, skill, experience, training or education. The trial court has broad discretion in admitting and excluding expert testimony. *LuMetta v. United States Robotics, Inc.*, 824 F.2d 768 (9th Cir.1987).

Van Lancker describes his qualifications as follows:

> Attached hereto and incorporated herein by reference is a current curriculum vi-

tae which sets forth my educational background and work experience. As the curriculum vitae indicates, I was an FBI agent for many years. My experience in civil rights violations began in Selma and Montgomery, Alabama, in 1962, during the racial unrest that existed at that time. I have done numerous investigations into civil rights violations. During my experience with the FBI, I have testified on numerous occasions concerning civil rights violations. Presently, I am employed as a consultant in civil litigation related to law enforcement matters.

*Id.* at p. 2, ¶ 2.

Van Lancker then testifies that he has examined the extensive record in the case and reached certain opinions. He concludes first that in light of Walker's passivity during the entire time leading up to his arrest, and in light of Officer Konst's profanities and failure to fully explain the warrant to Walker before attempting to handcuff him, Officer Konst used excessive force when he "grabbed Mr. Walker and attempted to put a wrist lock on Mr. Walker and handcuffed him." *Id.* at p. 5, ¶ 7.

The facts clearly show that Walker was never handcuffed. This is probably a typographical error in the affidavit. Van Lancker most likely meant to say that Officer Konst was attempting to "put a wrist lock on Mr. Walker *and handcuff* him."[4]

At any rate, Van Lancker's conclusion is astounding in its implications. There is no dispute here that Officer Konst was required by the warrant to take Walker into custody. According to Van Lancker, however, the officer cannot handcuff Walker because the crime is minor and Walker *appears passive.* Would Van Lancker follow his own advice in the field when he takes an arrestee into his custody? In that moment—far removed from a book-lined study, and with the arrestee within arm's length—would handcuffing appear more appealing? Will that passive arrestee re-

main passive? It is undisputed that such a custodial arrest puts the officer's safety at risk; are we to remove both the officer's discretion and the one procedure that would protect him, simply because the arrestee "appears" passive and was arrested for a minor crime? There is no law, rule, or city policy that dictates such a result. Common sense recoils at its suggestion. Under Rule 702, this testimony would be of no assistance, and should be stricken. In addition, when an expert's opinion rests on "unsupported assumptions and unsound extrapolation" it should be excluded. *McGlinchy v. Shell Chemical Co.,* 845 F.2d 802, 807 (9th Cir.1988).

■ The Court reaches the same result with Van Lancker's testimony on racism. Here, the testimony's flaws are compounded by the fact that Van Lancker has no expertise in racism beyond the experiences in his life that many of the rest of us hold. In addition, Van Lancker believes that Walker was singled-out for harassing treatment, but as already discussed, the evidence does not support this view. But this Court finds it especially ironic—and the officers must find it especially galling—that Van Lancker can tar the officers as racists without ever meeting them, simply by generalizing from a few misconstrued instances of behavior. An expert "qualified to give an opinion on one subject is not necessarily qualified to opine on others." *Rogers v. Raymark Industries, Inc.,* 922 F.2d 1426, 1431 (9th Cir.1991).

Van Lancker complains that the Boise Police Department had no written policy on racial sensitivity and racial relations, and that the lack of such a policy contributed to the "animosity" against Walker. But the record shows no such animosity by Officers Konst, Littlefield and Bevier, and the lack of a written policy appears to have had no effect in this case.

On the whole, the Court finds that Van Lancker's affidavit is inadmissible under Fed.R.Evid. 702. In his opinion on racism,

---

**4.** Witness Brad Gustafson testified that he thought that one of the officers succeeded in getting one of Walker's arms cuffed, but not the other. *See* Deposition of Gustafson at pp. 66–

69. No other witness corroborates this, and it is undisputed that Walker was not struggling with a handcuff dangling from one arm.

Van Lancker goes outside his area of expertise. In his opinions on excessive force, he has misconstrued the facts and offers opinions that are of no assistance. The motion to strike the affidavit of J.E. Van Lancker shall be granted.

The rulings in this decision have removed all of the federal claims from this case. As there is no diversity, this Court has the discretion to dismiss the remaining pendent state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court shall exercise that discretion and order that the pending state law claims be dismissed along with the federal claims.

## JUDGMENT

The Court has examined the entire record concerning the motion for summary judgment filed by defendants and the motion to strike affidavit of J.E. Van Lancker filed by defendants. In accordance with the views expressed in the memorandum decision accompanying this judgment,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the motion to strike affidavit of J.E. Van Lancker be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the motion for summary judgment filed by defendants be, and the same is hereby, GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants have judgment against the plaintiff for costs incurred herein to be awarded by the Clerk of Court after proper submission of cost bills.