Ramona SHELDON, as Personal Representative of the Estate of Albert Lee Sheldon, and Ramona Sheldon and George Sheldon, individually, Appellants,

v.

CITY OF AMBLER and Bryan Jones, Appellees.

No. S–12298.

Supreme Court of Alaska.

March 14, 2008.

C.R. Kennelly, Anchorage, for Appellants.

Howard S. Trickey, Matthew Singer, Jermain Dunnagan & Owens, P.C., Anchorage, for Appellees.

Mary Ann Lundquist, Assistant Attorney General, Fairbanks, Talis J. Colberg, Attorney General, Juneau, for Amicus Curiae State of Alaska.

Before: MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

This case arises out of the actions taken by Village Police Officer Bryan Jones on the night of June 24, 2002, in an effort to restrain

Albert Sheldon. Jones had put Sheldon, drunk and refusing to obey Officer Jones's orders, in a bear hug and then, performing a take down, shoved Sheldon to the ground. Sheldon fell, head-first, and died as a result of the injuries he sustained during the fall.

Sheldon's estate and Ramona and George Sheldon (hereinafter Sheldon) sued Bryan Jones and the City of Ambler (hereinafter Jones), alleging that Jones used excessive force in attempting to arrest Sheldon, violating Alaska statutes. The court below granted Jones's motion for summary judgment, ruling that Jones had qualified immunity for his actions. In reaching its decision, the superior court heavily relied on a recent United States Supreme Court decision, *Saucier v. Katz.*[1] Using *Saucier*, the court found that Jones did not have fair notice that a bear hug and take down were excessive uses of force.

We affirm the superior court's grant of summary judgment to Jones. We also use this opportunity to clarify this court's standard for qualified immunity, bringing it more explicitly in line with current federal case law.

## II. FACTS AND PROCEEDINGS

[1] The events leading to Sheldon's death are generally undisputed by the parties. Here we reproduce in full the superior court's description of the facts, keeping in mind that in considering a motion for summary judgment, our obligation is to interpret the facts in the light most favorable to the non-moving party.[2]

During the night and early morning of June 24–25, 2002, Albert Sheldon and his girlfriend Dora Williams attended a party in Ambler, Alaska and consumed alcohol that had been brought into Ambler by two bootleggers. Sheldon and Williams were fighting with each other throughout this period of time. They left the party early on June 25th and walked around the village. They were continuing to fight and yell at each other. They encountered Pauline Cleveland and Aggie Wood riding a four-wheeler. Despite the fighting and yelling, Cleveland and Wood allowed Sheldon and Williams to get on the four-wheeler with them and they rode around town for about 15 minutes. Sheldon continued to yell and to push Williams.

Cleveland and Wood then stopped the four-wheeler, and Sheldon and Williams got off. Cleveland and Wood went to the nearby home of Ambler's Village Police Officer (VPO) Bryan Jones. Cleveland asked him to "go cool off Albert. He's drunk." Wood informed VPO Jones that Sheldon "was beating on Dora [Williams] and we can't stop it."

VPO Jones responded about five minutes later at 6:15 a.m., wearing his uniform, badge and his normal police equipment. He recorded his entire encounter with Sheldon. He could hear shouting nearby and he quickly found Sheldon and Williams. He saw Sheldon apparently assaulting Williams in the street. Williams said she wanted to go home and did not want Sheldon to follow her. Wood and Cleveland arrived on the four-wheeler and Williams requested a ride home. Sheldon was clearly intoxicated at the time. He was screaming, belligerent, and would not respond to any of VPO Jones'[s] orders or commands. When he saw Williams back on the four-wheeler, Sheldon pushed VPO Jones aside to grab hold of the handlebars of the four-wheeler. He would not let go of the handlebars despite VPO Jones'[s] commands that he do so. Sheldon tried to grab Wood's key to the four-wheeler and threatened her when she moved his hand away. At this point VPO Jones used pepper spray on Sheldon, which caused Sheldon to scream louder. But he did not let go of the handlebars or follow any other commands of the officer.

VPO Jones then used his police baton to strike Sheldon on his hands and the back of his knees. When [Sheldon] still did not respond, VPO Jones struck him on the back and the back of his head with the baton. The plaintiff's medical expert, William F. Kinn, Jr., MD, found, assuming

1. 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

2. *See Samaniego v. City of Kodiak,* 2 P.3d 78, 82–83 (Alaska 2000).

that VPO Jones had hit Sheldon on the head with the baton, that the blow could not have caused the death since there "was no external evidence of direct trauma to the neck or scalp" which would have been expected if the blow had been severe enough to be fatal.

When Sheldon would still not let go of the handlebars, VPO Jones put him in a "bear hug." He wrapped his arms over Sheldon's arms and shoved him. Sheldon still did not let go, so VPO Jones shoved him again, performing a "take down." The two men fell. Sheldon was unable to use his arms, and he struck his head on the ground when he landed underneath VPO Jones. VPO Jones then handcuffed Sheldon, who continued yelling and struggling, and took him to the village's jail. Along the way, Sheldon collapsed and VPO Jones dragged him the rest of the way and put him in a cell by about 6:33 a.m.

VPO Jones then called the village Heath Aide to examine Sheldon. The Health Aide came to the station, briefly examined Sheldon and then left for a short time. By the time the Health Aide returned, VPO Jones had noticed that Sheldon was not breathing. VPO Jones and the Health Aide tried to revive Sheldon with CPR for about 30 minutes, but they were unsuccessful. Other villagers arrived to help with CPR, which continued another 10 minutes. Upon instructions from the doctor in Kotzebue to cease the CPR, the efforts ended and Sheldon was declared dead about 7:55 a.m. Viewing the facts most favorably to Sheldon for purposes of deciding the pending motion, the blow to his head from hitting the ground while in VPO Jones'[s] "bear hug" and "take down" caused Sheldon's death.

The superior court granted Jones's motion for summary judgment. In finding for Jones, the superior court did not primarily rely on this court's decision in *Samaniego v. City of Kodiak*.[3] In that case, we announced

the standard for qualified immunity based on our interpretation of AS 11.81.370 and 12.25.070.[4] Instead, the superior court used a 2001 United States Supreme Court decision, *Saucier v. Katz*.[5] The superior court reasoned that

> [w]hen the Alaska Supreme Court decided *Samaniego* [in 2000], it did not have the benefit of the United States Supreme Court's analysis in *Saucier*. Given the deference the Alaska Supreme Court has given to federal law in the excessive force area, it is reasonable to expect that the Alaska Supreme Court would adopt the *Saucier* analysis on this issue.

Using the *Saucier* analysis, the superior court held that Jones and the City of Ambler were protected by qualified immunity because "[t]here was no clearly established law ... that would have given a reasonable officer notice that the conduct in question, the use of a 'bear hug' and 'take down,' was unlawful or otherwise prohibited." The superior court mentioned a 1992 decision from a federal court in Idaho that found that the use of a bear hug in an attempt to "contain and control rather than to abuse or dominate" was not excessive force.[6]

Even though the superior court found that qualified immunity protected the defendants, it conducted an excessive force analysis "to provide a complete record." The court concluded that there was a genuine issue of material fact as to whether Jones used excessive force. The superior court did not discuss the negligent training claim made by Sheldon's estate.

Sheldon's estate appeals on the ground that immunity was improperly granted to Jones. Sheldon's estate argues that the superior court erred in adopting *Saucier* and that summary judgment would not have been warranted under the standard this court adopted in *Samaniego*. The estate also suggests, in its reply brief, that a genuine issue of material fact still remains as to whether

**3.** *Id.*

**4.** *Id.* at 80.

**5.** 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**6.** *Franklin v. City of Boise,* 806 F.Supp. 879, 886 (D.Idaho 1992).

Sheldon's death was the result of the City of Ambler's negligent training of VPO Jones. The State of Alaska has filed an amicus brief in support of the superior court's decision, urging us to overrule *Samaniego* "since it applies an abandoned doctrine and more good than harm will result from its demise."

## III. DISCUSSION

### A. The Standard for Qualified Immunity

■ This case, and the superior court's ruling below, require us to reexamine our previous decisions on qualified immunity and to clarify the standard for granting immunity to police officers. On the one hand, the appellees implicitly, and the state explicitly, urge us to depart from our ruling in *Samaniego* and instead adopt the Supreme Court's standard announced in *Saucier*. On the other hand, the appellants contend that we should adhere to the *Samaniego* standard. Appellees and the state are correct that this court usually follows federal case law in the area of qualified immunity;[7] their suggestion that we depart from *Samaniego* is bolstered by the fact that the Ninth Circuit decision on which *Samaniego* partially relied[8] was reversed by the United States Supreme Court in *Saucier*.[9] But appellants are also correct that we are not bound to follow federal law in designing our own judicial standard for excessive force. We are here dealing with the interpretation of Alaska statutes, not federal law, and have no obligation to follow federal case law. Both sides make credible arguments.

Unlike the appellees and the state, we do not find that *Samaniego* is clearly contradicted by *Saucier*. Rather, we find *Samaniego's* standard to be ambiguous, at points seeming to vary from the later adopted *Saucier* stan-

dard, and at other points describing a standard that is in principle much closer to *Saucier*. Nonetheless, unlike the appellants, we are persuaded that *Samaniego* should be read in a way that more closely conforms to the standard developed in *Saucier*. We therefore take the opportunity provided by this case, not to overturn *Samaniego*, but rather to clarify its holding. In the words of the superior court, we choose to follow *Samaniego* "as modified by" *Saucier*, rather than abandon it.

In *Saucier*, the United States Supreme Court emphasized that in deciding whether an officer is eligible for qualified immunity one must not merely look to whether an officer's actions were objectively reasonable, but also to whether the officer might have *reasonably believed* that his actions were reasonable.[10] Would a reasonable officer, in other words, have been "on notice" that his particular use of force would be unlawful?[11] Or could he have reasonably believed that his actions were legal?

■ This test recognizes that there may be behavior that is objectively unreasonable but that nonetheless an officer might have reasonably believed *was* reasonable. If this is the case, then the officer should be entitled to qualified immunity for his behavior. As the Supreme Court wrote, "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.... If the officer's mistake as to what the law requires is reasonable ... the officer is entitled to the immunity defense."[12] In other words, a reasonable but mistaken belief can confer immunity on an officer *even after* it has been established that the officer violated a constitutional right by behaving unreasonably. We find that this concern to protect officers who reasonably believe that their

---

**7.** In *Breck v. Ulmer* we wrote that this court "choose[s] to follow federal precedent" in the area of qualified immunity. 745 P.2d 66, 71–72 (Alaska 1987).

**8.** *Katz v. United States*, 194 F.3d 962 (9th Cir. 1999), *rev'd sub nom. Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). For *Samaniego's* citations of *Katz*, see *Samaniego*, 2 P.3d at 84 nn. 19–20.

**9.** *Saucier*, 533 U.S. at 209, 121 S.Ct. 2151.

**10.** *Id.* at 205, 121 S.Ct. 2151.

**11.** "If the law d[oes] not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Id.* at 202, 121 S.Ct. 2151.

**12.** *Id.* at 205, 121 S.Ct. 2151.

actions are lawful furthers the rationale we announced in *Samaniego:* to recognize the reality that "police officers, in pursuit of their dangerous and important jobs, are often forced to make difficult decisions regarding the use of force." [13]

*Saucier* overturned the Ninth Circuit's decision in *Katz,* a decision which *Samaniego* cited twice in its discussion of qualified immunity.[14] What *Katz* denied, and *Saucier* asserted, was that an officer's mistaken but reasonable belief about the legality of his actions could secure that officer qualified immunity. The problem with *Katz* was that it turned the qualified immunity analysis solely into the question of whether the actions of an officer were "objectively reasonable." [15] It did not allow the possibility that an officer might act in a way that was objectively unreasonable and still be immune from suit because he reasonably but mistakenly believed that his actions were lawful.

The state, in its brief, argues that *Samaniego* errs in the same way in which *Katz* did, by focusing solely on whether the officer's behavior was "objectively reasonable." Indeed, *Samaniego* cited *Katz* at two key points.[16] The emphasis on objective reasonableness is also seemingly in evidence in *Samaniego's* concluding paragraphs. The opinion concluded that the "proper analysis of defendant officers' claims of privilege to rebut excessive-force allegations ... is to examine the objective reasonableness of the officers' use of force in making an arrest." "It was error to apply," the *Samaniego* opinion ended, "an immunity analysis driven by the officers' subjective beliefs as to the reasonableness of the force used." [17]

Because it relied on *Katz,* the state asks us now to overturn *Samaniego* based on the "changed circumstances" that include the United States Supreme Court's decision in *Saucier.* "[B]y continuing to follow *Katz,*" the state argues, "this Court has diverged from the very federal precedent that it intended to follow." Accordingly, the state asks us to declare that *Samaniego* is no longer good law.

We agree that *Samaniego* attempted to be faithful to federal precedent, but we disagree as to the extent it diverges from that precedent even now, after *Saucier.* In beginning its analysis of qualified immunity, our court in *Samaniego* noted that it had, in a prior case, adopted "the federal ... test for official immunity." [18] It then proceeded to cite and quote from *Mathis v. Sauser,* an Alaska Supreme Court decision that relied directly on the United States Supreme Court's decision in *Anderson v. Creighton.*[19] Under the federal standard, we emphasized in *Samaniego,* "the relevant inquiry is whether a reasonable official could have believed the challenged conduct was lawful in light of clearly established law and the facts of the case." [20]

Here is what *Saucier* would later identify as the "reasonable, but mistaken, beliefs" aspect of the qualified immunity inquiry.[21] That is, qualified immunity can be conferred when an officer could have reasonably believed that his conduct was lawful (even if it was not). By invoking *Anderson,* a case on which *Saucier* explicitly relied,[22] this court

---

13. *Samaniego,* 2 P.3d at 88.

14. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). For *Samaniego's* citations of *Katz, see Samaniego,* 2 P.3d at 84 nn. 19–20.

15. *See Saucier,* 533 U.S. at 205, 121 S.Ct. 2151 (a qualified immunity inquiry has a "further dimension," the point of which "is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct").

16. *Samaniego,* 2 P.3d at 84 nn. 19–20 (quoting *Katz v. United States,* 194 F.3d 962, 968 (9th Cir.1999)).

17. *Id.* at 88.

18. *Id.* at 84 (citing *Breck v. Ulmer,* 745 P.2d 66, 71–72 (Alaska 1987)).

19. *Id.* (quoting *Mathis v. Sauser,* 942 P.2d 1117, 1124–25 (Alaska 1997) (citing *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987))).

20. *Id.* (quoting *Mathis,* 942 P.2d at 1124); *see also Crawford v. Kemp,* 139 P.3d 1249, 1255–56 (Alaska 2006) (citing *Saucier,* 533 U.S. at 202, 206, 121 S.Ct. 2151).

21. *Saucier,* 533 U.S. at 206, 121 S.Ct. 2151.

22. *See Saucier,* 533 U.S. at 200, 121 S.Ct. 2151 (stating that the decision by the Ninth Circuit in *Katz* "cannot be reconciled" with *Anderson* ).

signaled its recognition that the beliefs of the officer, supposing that they are reasonable, were relevant to a qualified immunity inquiry. If *Samaniego* had stopped there, there would be no doubt that, in Alaska, an officer would be entitled to qualified immunity if he reasonably believed that his conduct was lawful, even if that conduct was objectively excessive.

Unfortunately, the *Samaniego* court subsequently muddied its clear statement by writing, in the immediately following sentence, that "[i]n other words, '[w]hether an official may prevail in his qualified immunity defense depends upon the objective reasonableness of [his] conduct.' "[23] The use of "in other words" suggested that the inquiry into the objective reasonableness of an officer's conduct was the only inquiry, of which an inquiry into the reasonableness of an officer's beliefs was simply a part. This suggestion goes against the holding in *Saucier* which says that finding the absence of objective reasonableness—here excessive force—is only the first step; the court must *then* go on to determine whether the officer could have had a reasonable belief that his conduct was lawful. This is the "reasonable but mistaken belief" prong of the qualified immunity analysis which *Saucier* elaborated.

In context, however, it becomes clearer what the *Samaniego* court meant to emphasize. In emphasizing "objective reasonableness," the opinion did not, or did not necessarily, mean to apply only the single standard of *Katz*, but instead to distinguish "objective reasonableness" from the (merely) subjective beliefs of police officers. The court had made clear, earlier in its opinion, that a focus on an officer's beliefs was relevant. This inquiry is not merely into what he happened to *feel* was right, but whether he was *reasonable* in believing that his conduct was legal. Hence, early in the opinion, the court wrote that "[i]t must be borne in mind, though, that when we analyze the issue of reasonableness of the use of force, we focus on ... what reasonable officers *in their position* could have thought."[24]

■ Thus, as the court emphasized later in the opinion, and immediately after it seemed to endorse objective reasonableness as the only relevant standard, "[b]ecause objective reasonableness is required, officers do not enjoy immunity on account of their subjective good faith alone."[25] But such a sentiment forbidding immunity on the basis of "subjective good faith" is compatible with allowing immunity based on *reasonable mistake.* A police officer might make a good faith mistake in believing that his action is legal; this does not, however, prevent that same belief from being unreasonable for that officer to hold.[26] The conclusion of *Samaniego,* which stresses that the subjective beliefs of officers should not be relevant to the qualified immunity inquiry should also be read in this light: *merely* subjective beliefs about reasonableness are not enough; the beliefs must also be ones a reasonable officer could have had about the legality of his actions. As the court notes in a footnote, citing a previous case, even a good faith defense must have "an objective component,"[27] even though it examines the beliefs and not the actions of an officer.

■ We also read *Samaniego's* summation of the qualified immunity analysis, that "the reasonableness of an officer's actions is to be assessed in light of all the relevant circumstances of the case at hand,"[28] to implicitly include the "reasonable but mistaken belief" element of the *Saucier* test. Both the objective reasonableness of the conduct and the reasonableness of the officer's belief in the legality of his conduct are part of the "rele-

---

23. *Samaniego,* 2 P.3d at 84 (quoting *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982))).

24. *Id.* at 80 (emphasis in original).

25. *Id.* at 84.

26. *Id.* at 85 (stating that the officer's subjective belief was not the same as "establishing ... that a reasonable officer ... could have believed that his or her safety was endangered").

27. *Id.* at 84 n. 18 (citing *City of Nome v. Ailak,* 570 P.2d 162, 171–72 (Alaska 1977)).

28. *Id.* at 84.

vant circumstances" that must be assessed in order to determine whether an officer is entitled to qualified immunity for his actions. Read in this light, our decision in *Samaniego* comports in all essential respects with the Supreme Court's decision in *Saucier*, especially in its concern to grant immunity in cases where an officer might have reasonably believed that his conduct was lawful. Insofar as our decision today may be taken to "modify" *Samaniego*, it is this modification that is now controlling.[29]

### B. Application of the Standard

■ Given the standard for qualified immunity, the question that we are required to ask and answer in this case becomes straightforward: could Village Police Officer Jones have reasonably believed that his actions were lawful, that is to say, not excessive? If he did have "fair notice" that a bear hug and take down were unlawful, and if there is a factual disagreement over whether he used excessive force, then the case should go to trial. In their brief, the appellants contend that Jones was "on notice" that his conduct was excessive because AS 11.81.370 and 12.25.070 gave him that notice. But these statutes are only general statutes which set out when deadly force is appropriate, the latter indicating only that a police officer making an arrest may not use any restraint that is not necessary and proper for the arrest or detention of a person. Such statutes cannot purport to give notice to officers that specific actions taken in specific circumstances may or may not be reasonable.[30] Of course, courts can also run the risk of error in going too far in the other direction—that each situation, in its particu-

larity, could not have been anticipated by any law or regulation, so an officer could never be on notice that *this* use of force in *this* set of circumstances could be unlawful. Courts must strike a balance between these two extremes.

■ One way in which they have tried to strike this balance, and the approach we adopt here, is to look to our own jurisdiction and other jurisdictions to see if there are any cases, laws, or regulations which would suggest that the type of action taken by the officer is considered unlawful.[31] The existence of such laws or cases would demonstrate, or at least serve as probative evidence, that there was some kind of "notice" that the officer could have had about the legality of his actions. In this instance, the lack of evidence from other jurisdictions that a bear hug and a take down would be unlawful is telling. The nearest case that either side was able to discover is one from a district court in Idaho, *Franklin v. City of Boise*.[32] In that case the court found that police actions that included a bear hug in an effort to effect an arrest did not constitute uses of excessive force.[33] Although the facts of *Franklin* are not on all fours with the case before us,[34] we find this case good, though slight, evidence that Jones might have reasonably believed that his actions were lawful. But the silence speaks even louder in this case. Even supposing that the hypothetical reasonable Alaska police officer should be informed about district court cases from Idaho, we find much more persuasive the fact that there is no clear case or law or regulation from Alaska, or from anywhere else, that says that a bear hug and a take down are

---

**29.** To the extent that *Samaniego's* brief discussion of *Katz* contradicts this analysis, we overrule that part of the opinion. *See Samaniego*, 2 P.3d at 84 nn. 19–20 and accompanying text.

**30.** *See Brosseau v. Haugen*, 543 U.S. 194, 199–200, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (noting that standards for notice must be relevant to the particular circumstances in which the officer acts).

**31.** *See id.* at 199–201, 125 S.Ct. 596 (analyzing cases to determine if officer was given fair warning that shooting a fleeing suspect who presents a risk to others was a use of excessive force).

**32.** 806 F.Supp. 879 (D.Idaho 1992).

**33.** *Id.* at 886.

**34.** Franklin made repeated attempts to escape and the actual take down occurred in a pond and resulted in Franklin's death by drowning. *Id.* Sheldon was not in the act of escaping or even attempting to escape. Sheldon, however, was disobeying Jones's commands, and we believe that the facts also clearly show him to be an immediate threat to those around him.

excessive uses of force when applied to an intoxicated and assaultive arrestee.

But there is still one argument left to the appellants, and this argument is that Jones's use of a bear hug was so egregious, so excessive, that he should have known it was unlawful, that the nature of the act gave sufficient warning that a bear hug and a take down were excessive means to restrain someone.[35] One should not let the lack of explicit law in an area be a substitute for the reasonable officer's common sense. Although the series of events in this case resulted in tragedy, Jones's conduct was not shocking. He did not do anything we can now, on reflection, say that he should have known at the time was excessive and unlawful. Cognizant of the reality that officers must often make quick judgments which might have unanticipated consequences, we must resist the urge to second guess those actions when things turn out badly.[36] We decline to do so today and confirm that Jones, in acting as he did, could have reasonably believed that his actions were not excessive. Under our reading of *Samaniego*, Jones is entitled to immunity.

## IV. CONCLUSION

The superior court, in the interests of having a "complete record" on this case, went on to examine whether Jones had used "excessive force." It concluded that there was a genuine issue of material fact as to whether the officer had used excessive force in apprehending Albert Sheldon. If objec-

tive reasonableness were the only test, then this conclusion would be the end of the matter: Sheldon's case should go to trial. But since Jones could have reasonably believed that his use of force was lawful and not excessive, and is immune on this ground, we need not reach the further question of whether there is a genuine issue of material fact over whether his behavior was "objectively reasonable."[37] Nor do we reach the appellant's claim that the City of Ambler failed to train Jones adequately. This issue we find to be waived because it was only raised in the appellant's reply brief.[38]

We therefore AFFIRM the superior court's ruling.

FABE, Chief Justice, and BRYNER, Justice, not participating.

---

35. *Hope v. Pelzer*, 536 U.S. 730, 745, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (obvious cruelty of practice of tying prisoner to a post "should have provided respondents with some notice" that the conduct was a violation of Constitutional rights).

36. *See Samaniego v. City of Kodiak*, 2 P.3d 78, 88 (Alaska 2000) (defending the rationale of immunity in these terms).

37. *Saucier* requires that the liability question—viewing the facts most favorably to the plaintiff—be determined by the trial court before the immunity question. Requiring this sequencing has been controversial. *See Brosseau v. Haugen*, 543 U.S. 194, 201, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (Breyer, J., concurring, joined by Ginsberg & Scalia, JJ.) (noting the concern that the *Saucier* rule "rigidly requires courts unnecessarily to decide difficult constitutional questions when there is available an easier basis for the

decision (e.g., qualified immunity) that will satisfactorily resolve the case before the court"); *Lyons v. City of Xenia*, 417 F.3d 565, 580–84 (6th Cir.2005) (Sutton, J., concurring) (questioning the sequencing requirement of *Saucier*); Pierre N. Leval, *Judging Under the Constitution: Dicta about Dicta*, 81 N.Y.U. L.Rev 1249, 1275 (2006) (calling the sequencing requirement "a puzzling misadventure in constitutional dictum"). In the present case the order in which the relevant issues should be decided is not in question. We therefore have no occasion to decide whether to adopt this aspect of the *Saucier* opinion.

38. *See* Alaska R.App. P. 212(c)(3) (a party's reply brief "may raise no contentions not previously raised in either the appellant's or the appellee's briefs").