Sandra RUSSELL, for and on behalf of
J.N., a Minor Child, Appellant,

v.

Corporal Lee VIRG–IN and The
City of Kotzebue, Appellees.

No. S–13537.

Supreme Court of Alaska.

July 22, 2011.

Ted Stepovich, Law Office of Ted Stepovich, Anchorage, for Appellant.

Joseph W. Evans, Law Offices of Joseph W. Evans, Bremerton, Washington, for Appellees.

Before: CARPENETI, Chief Justice, FABE, WINFREE, and STOWERS, Justices.

## OPINION

FABE, Justice.

## I. INTRODUCTION

In July 2003 Officer Lee Virg–In used a taser two times on J.N., an 11–year–old girl. J.N. had been driving an ATV through the streets of Kotzebue with another young passenger. J.N. ran several stop signs and was otherwise driving dangerously, and Officer Virg–In used overhead lights and a siren to signal to J.N. to stop. J.N. refused to stop, first trying to escape on the ATV and later fleeing on foot. Officer Virg–In chased J.N. on foot and caught up with her. According to J.N., she was never aggressive or threatening towards Officer Virg–In, and she had already stopped running and was no longer attempting to flee when Officer Virg–In deployed his taser. He first shot the probes and caught them on J.N.'s jacket and then grabbed J.N. by the elbow and shocked J.N. on the shoulder with the taser as he held onto her elbow. Officer Virg–In then handcuffed J.N. and took her to the police station.

J.N., through her mother Sandra Russell, filed a complaint against Officer Virg–In, alleging that his use of the taser constituted excessive force. J.N. also sued the City of Kotzebue, claiming improper and negligent supervision or training. Officer Virg–In defended the reasonableness of his actions and argued that he was immune from suit. On summary judgment, the superior court found that Officer Virg–In was entitled to qualified immunity because a reasonable officer might not have known that the use of a taser under the circumstances would be an excessive use of force. The superior court also dismissed

J.N.'s claims against the City based on Officer Virg–In's entitlement to qualified immunity. Finally, the superior court awarded attorney's fees and costs to Officer Virg–In and the City, assessing the fees and costs against Russell.

We conclude that it was error to grant Officer Virg–In qualified immunity on summary judgment because if a police officer used a taser multiple times on an 11–year–old girl who was suspected of traffic violations, was compliant, and was not posing a threat to the officer or others, that conduct could be so egregious that any reasonable officer would have known that the conduct was an excessive use of force. We also reverse the grant of summary judgment dismissing J.N.'s improper and negligent training or supervision claims against the City of Kotzebue.

## II. FACTS AND PROCEEDINGS

### A. Factual History[1]

On the night of July 29, 2003,[2] Kotzebue police officer Corporal Lee Virg–In used an Advanced Taser (taser) while arresting 11–year–old J.N. The incident began earlier in the evening when, while driving in a marked police department vehicle, Officer Virg–In and his partner Officer Eric Swisher saw J.N. driving an ATV at approximately 30–35 m.p.h. through the streets of Kotzebue with a young female passenger. Officer Virg–In's incident report states that J.N. was five feet tall and weighed 100 pounds, which the report describes as a "slender" build. The officers saw J.N. run a stop sign and turned on their overhead lights and siren to signal to J.N. to stop. J.N.'s passenger turned and saw the police vehicle, but J.N. drove off, eluding the officers. About an hour later, the officers again spotted J.N. on the ATV, saw her go through a stop sign, and turned on their overhead lights and siren. J.N. again drove away from the officers,

---

1. We interpret the facts in the light most favorable to J.N. as the non-moving party and draw all reasonable inferences in her favor. *See Sheldon v. City of Ambler,* 178 P.3d 459, 461 (Alaska 2008) (citing *Samaniego v. City of Kodiak,* 2 P.3d 78, 82–83 (Alaska 2000)).

2. Appellant's brief and the superior court opinion state that the date of the taser incident was July 29, 2005, but the incident actually occurred on July 29, 2003. J.N. filed her complaint in February 2005.

going an estimated 35–40 m.p.h. and failing to stop at two more stop signs. J.N. then drove the ATV off the street and through a field, emerging from behind a building and nearly hitting the officers' police vehicle head on—both vehicles veered around each other to prevent a collision. J.N. drove back onto the street, but her ATV stalled. Both girls left the ATV and started running away from Officer Virg–In on foot. Officer Virg–In got out of his vehicle, began chasing the girls, and yelled for them to stop. J.N. continued to run, and Officer Virg–In continued to chase her and yell for her to stop.

According to J.N., she ran between three female teenagers on the street and was stopped by one of them. She testified that she "stopped right away" and was "face to face" with Officer Virg–In, "wait[ing] for him" as he came within two or three feet of her and deployed the taser's probes.[3] J.N. described the incident:

> I went around [the senior center buildings] and ... [another girl] grabbed me. I stopped. I was tired. Virg–In was right behind me. I turned around and I saw him. He pulled out his gun, and a whole— a couple of wires came out, you know, a couple strings. One caught my coat. The other—the other one caught my chest. I asked him what he did that for and then he shocked me. The first one happened so fast, but then the second time he put it to my shoulder.

J.N.'s passenger confirmed in an affidavit that she saw Officer Virg–In "shoot" J.N. with the taser and then "walk up to [J.N.] and touch [t]aser [J.N.] again and she fell to the ground." The passenger agreed with J.N.'s testimony that J.N. was "not running away at the time that Officer Virg–In used the [t]aser on [J.N.]." Officer Virg–In acknowledged that when he used the taser the

second time he was holding onto J.N.'s elbow and was also shocked by the current when he touch-tasered J.N.

Officer Virg–In then handcuffed J.N. and took her to the Kotzebue police station. Another officer examined J.N. and noted that her coat had one taser probe still embedded in it and that there was a small red mark on J.N.'s upper right chest. J.N. was later adjudicated a delinquent minor for the misdemeanor offense of "failure to stop at the direction of a peace officer in the second degree."

As to her injuries, J.N. testified that when the taser probes hit her she "got really stiff" and when Officer Virg–In touched her with the taser, she "collapsed." She stated that she was shocked with the taser "for a good minute ... you could feel it ... pulsing." J.N. described that after she was touched with the taser, "[i]t burned at first" and then she "could see [her] vein come out. It was darker." She elaborated that she hurt for a "couple of days" and that she had trouble sleeping on the night of the incident because she woke up with nightmares. J.N. admitted that after a "couple" of days she was "okay" and that the pain "slowed down" and was gone after three or four days. But J.N. still had nightmares and trouble sleeping that occurred "once in a while" over the next three years. In these nightmares, J.N. testified, she would see "a guy in a uniform" who would chase her as she ran from him; sometimes the figure in the dream would handcuff her and leave her on the ground and once she dreamed that she was taken to jail. J.N. never took any medication for her sleeping issues and never saw a counselor or doctor for the problem.[4]

J.N. maintained that Officer Virg–In knew who she was and knew where she lived and

---

**3.** Variously referred to as "probes," "darts," "wires," or "harpoons," these are "two metal probes [that] are propelled ... from a replaceable cartridge"; they "have the appearance of small, straightened fish-hooks ... [and are] connected to the weapon by a fine insulated wire." Operationally, "[w]hen both probes contact the target, the device automatically delivers several seconds of electric current ... designed to affect the motor nervous system and muscles, causing physical incapacitation." Deploying these

probes is an alternative to using a taser in the "direct contact stun mode," which is a pain compliance technique.

**4.** The connection between the taser incident and J.N.'s emotional and mental injuries was highly contested in the superior court. For purposes of a summary judgment review, however, we view the facts relating to J.N.'s alleged injuries in the light most favorable to J.N. *See supra* note 1.

thus "could have easily avoided the use of force by waiting and picking her up at home." She noted that "Kotzebue is a very small place, it is isolated." Moreover, J.N. argued that she was not "wanted because of a serious or violent felony crime."

### B. Proceedings

■ On February 17, 2005, J.N.'s mother Sandra Russell filed a complaint "by and for" J.N. as a minor child. The complaint alleged that Officer Virg–In "apprehended and arrested [J.N.] using excessive unnecessary force, stunning [J.N.] twice with a stun gun with no justification for the use of such excessive force ... causing her injury and great pain." [5] J.N. also alleged that the City "improperly and negligently supervised or trained" Officer Virg–In in the appropriate use of force. J.N. sought damages against Officer Virg–In and the City, "jointly and severally for the same injury" plus costs, interest, and attorney's fees, and requested punitive damages against Officer Virg–In. Officer Virg–In and the City answered J.N.'s complaint, denying J.N.'s allegations and raising several defenses. Among other assertions, Officer Virg–In claimed that he had "a qualified privilege to use reasonable force in making an arrest ... [and] immunity based upon objective reasonableness."

On August 27, 2008, Officer Virg–In and the City moved to dismiss all of J.N.'s claims on summary judgment.[6] Citing post–2003 case law, Officer Virg–In argued that "[t]he use of a [t]aser to subdue an unruly, fleeing juvenile is a proper use of force and does not constitute excessive force." In addition, Officer Virg–In contended that he was entitled to qualified immunity because "no cognizable legal precedent" would have put him "on notice that the use of a [t]aser in this situa-

tion was prohibited, unlawful conduct for a police officer." Officer Virg–In and the City also maintained that J.N.'s claim against the City should be dismissed based on Officer Virg–In's entitlement to qualified immunity and on the merits.

J.N. opposed the summary judgment motion on September 29, 2008. She responded that "there is no requirement that there be a specific case on point that would have led Officer Virg–In to believe that use of a [t]aser in this situation was excessive." J.N. maintained that the law "was clearly established in July 2003" that "it would be [ ] excessive use of force to use a [t]aser on a juvenile that posed little or no threat to the Officer or third parties." J.N. also argued that there were issues of fact precluding summary judgment as to "whether the City failed to properly train Virg–In by having a written policy governing [t]aser use and reviewing that written policy with its officers" and also regarding "whether Virg–In violated plaintiff's constitutional right to be free from the unlawful use of excessive force." The superior court heard oral argument on December 5, 2008.

On April 9, 2009, the superior court issued an order granting Officer Virg–In's and the City's motions for summary judgment. The superior court concluded that it was "undisputed that Officer Virg–In's effort to stop [J.N.] was within the scope of his discretionary authority." The court then considered: (1) the objective reasonableness of Officer Virg–In's actions; and (2) "whether 'clearly established' law existed to inform him of applicable constitutional standards for this situation." The superior court described the relevant circumstances, viewing the facts in J.N.'s favor: Officer Virg–In used a taser

---

**5.** It is unclear whether J.N. intended to raise federal constitutional torts under 42 U.S.C. § 1983 along with state law tort claims. Like most courts, we do not require litigants to specify that they are suing under § 1983. *See Fairbanks Corr. Ctr. Inmates v. Williamson,* 600 P.2d 743, 747 (Alaska 1979) (concluding that a complaint stated a cause of action under § 1983 based on "[c]ombining the broad purposes of 42 U.S.C. § 1983 to provide a cause of action upon allegations of facts constituting deprivation under color of state authority of federal constitutional rights with the liberal pleading provisions of

Alaska Rule of Civil Procedure 8"). *See generally* Sword and Shield Revisited· A Practical Approach to Section 1983 122 (Mary Massaron Ross ed. 1998). At oral argument, counsel for J.N. stated the he did not believe that any § 1983 claims had originally been alleged, but added that he was not waiving such claims.

**6.** Before the motion for summary judgment was filed, the case had been substantially delayed due to the death of J.N.'s attorney in June 2006.

twice on an 11–year–old girl who had already stopped; who had ceased her attempt to escape; and who had not used any aggressive or threatening behavior to escape arrest. In these circumstances, the superior court found "triable issues of fact as to the objective reasonableness of the officer's actions" and denied summary judgment on this point.

Nonetheless, the superior court ultimately determined that Officer Virg–In was entitled to qualified immunity because no clearly established law in July 2003 would have put him on notice that his conduct was unlawful. The superior court first determined that the two Alaska statutes related to use of force were insufficient to notify Officer Virg–In that the use of a taser to arrest an 11–year–old suspect was unlawful.[7] Looking to case law, the superior court found that the cases presented by J.N. were "quite distinguishable" and that it was " 'telling' that neither party could provide authority prior to July 2003 as to the use of [t]asers on young people." Taking note of J.N.'s "reckless[ ] behavior which resulted in hazards to the community" and her "previous determined efforts to escape," the superior court found that J.N. had "not shown that the law was clearly established that Officer Virg–In should have known that his two uses of the [t]aser during the incident would violate [J.N.'s] constitutional rights."

The superior court then explained that even in the absence of clearly established law, "[i]f an officer's conduct is so extreme that any reasonable officer would know the force used was excessive, the officer cannot be shielded by qualified immunity." The superior court concluded, however, that Officer Virg–In's conduct in response to J.N.'s "reckless behavior" and previous "determined efforts to escape" was "not so egregious or lacking in common sense that he would have known [it was] excessive even without the guidance of prior law." Summary judgment was granted to Officer Virg–In.

Turning to J.N.'s negligent training or supervision claim, the superior court concluded that "there would be a triable issue of fact as to the adequacy of training and supervision of Kotzebue police officers as to the use of [t]asers. But for qualified immunity, this issue would result in denial of the defendants' motion for summary judgment on these claims." But the superior court granted the City's motion for summary judgment on J.N.'s negligent training or supervision claim "based on the qualified immunity of the officer." Final judgment was entered on April 29, 2009.

On June 4, 2009, Officer Virg–In and the City moved for attorney's fees under Alaska Civil Rule 82. J.N. opposed the fees motion, contending that the amount of fees should be modified for equitable factors under Rule 82(b)(3) and that Russell could not be personally liable for fees because she brought the claim as J.N.'s representative. The superior court held a hearing on attorney's fees on October 8, 2009, and requested additional briefing on certain issues. On January 8, 2010, the superior court ordered that the claimed fees and costs were reasonable and that Russell was personally liable for the fees and costs awarded in the amount of $43,144.32.

J.N. appeals both the superior court's final judgment granting Officer Virg–In and the City's motions for summary judgment and the award of attorney's fees and costs.

## III. STANDARD OF REVIEW

 "We review [a] grant of summary judgment de novo, reading the record in the light most favorable to the non-moving party and making all reasonable inferences in its favor."[8] We "will affirm a grant of summary judgment when there are no genuine issues of material fact and the moving party is

---

**7.** *See* AS 11.81.370(a) ("In addition to using force justified under other sections of this chapter, a peace officer may use nondeadly force and may threaten to use deadly force when and to the extent the officer reasonably believes it necessary to make an arrest, to terminate an escape or attempted escape from custody, or to make a lawful stop."); AS 12.25.070 ("A peace officer or

private person may not subject a person arrested to greater restraint than is necessary and proper for the arrest and detention of the person.").

**8.** *Schug v. Moore,* 233 P.3d 1114, 1116 (Alaska 2010) (internal quotation marks omitted).

entitled to judgment as a matter of law." [9]

"The applicability of both state and federal immunity are questions of law that are ... subject to *de novo* review." [10] Under the de novo standard of review, we will "apply our independent judgment to questions of law, adopting the rule of law most persuasive in light of precedent, reason, and policy." [11]

## IV. DISCUSSION

### A. Qualified Immunity And Claims Of Excessive Force

Qualified immunity shields public officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." [12] The purpose of qualified immunity is to "balance[ ] two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." [13] Whether officials perform their duties reasonably "is judged against the backdrop of the law at the time of the conduct" because "the focus is on whether the officer had fair notice that her conduct was unlawful." [14] Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." [15]

Alaska statutes provide that a police officer "may not subject a person arrested to greater restraint than is necessary and proper for the arrest and detention of the person" [16] and allows an officer to "use nondeadly force and [ ] threaten to use deadly force when and to the extent the officer reasonably believes it necessary to make an arrest, to terminate an escape or attempted escape from custody, or to make a lawful stop." [17] The use of excessive force is thus a statutory violation and may also run afoul of the Fourth Amendment to the United States Constitution and article I, section 14 of the Alaska Constitution, both of which grant citizens a right "to be secure in their persons" and protect against "unreasonable searches and seizures." Pursuant to federal law, whether a police officer uses excessive force in making an arrest depends on the gravity of the intrusion (the type and amount of force inflicted) balanced against the government's need for that intrusion (as measured by the severity of the crime, whether the suspect posed an immediate threat to the officer's or the public's safety, and whether the suspect was resisting arrest or attempting to escape). [18] The standard for excessive force in Alaska is nearly identical—the three considerations that frame the excessive force inquiry are the severity of the crime, whether the suspect immediately threatens the safety of the police or others, and whether the suspect is actively resisting or fleeing arrest. [19]

9. *Id.*

10. *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008).

11. *Jacob v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 177 P.3d 1181, 1184 (Alaska 2008) (internal quotation marks omitted).

12. *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.").

13. *Pearson*, 129 S.Ct. at 815.

14. *Brosseau*, 543 U.S. at 198, 125 S.Ct. 596.

15. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

16. AS 12.25.070.

17. AS 11.81.370(a).

18. *See, e.g., Espinosa v. City & County of San Francisco*, 598 F.3d 528, 537 (9th Cir.2010) (citing *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (other internal citations omitted).

19. *Samaniego v. City of Kodiak*, 2 P.3d 78, 86 (Alaska 2000) (concluding that the federal framework from *Graham* is "persuasive" and "adopt[ing] it as an elaboration of [Alaska's] common-law standard of reasonable force"), *overruled in part by Sheldon v. City of Ambler*, 178 P.3d 459 (Alaska 2008); *see also Wasserman v. Bartholomew*, 38 P.3d 1162, 1169–70 (Alaska 2002) (approving a trial court's use of *Graham's*

■ Police officers, like other public officials, are protected by qualified immunity when they exercise discretionary functions.[20] Alaska Statute 09.65.070(d) provides for statutory immunity:

An action for damages may not be brought against a municipality or any of its agents, officers, or employees if the claim ... (2) is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees.

We have added that Alaska "usually follows federal case law in the area of qualified immunity." [21]

In 2001 the United States Supreme Court in *Saucier v. Katz* announced a new federal qualified immunity standard.[22] The Court clarified that a decision on qualified immunity "should be made early in the proceedings" [23] because it is "an entitlement not to stand trial or face the other burdens of litigation." [24] *Saucier* set out a two-part test for determining entitlement to qualified immunity: (1) whether the facts alleged show that the officer's conduct violated a constitutional right; and (2) whether the right was "clearly established," meaning that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." [25] A later United States Supreme Court decision held that courts have the discretion to address either of the *Saucier* prongs first.[26]

■ In 2008, partially in response to *Saucier*, we "reexamine[d] our previous decisions on qualified immunity and [ ] clarif[ied] the standard for granting immunity to police officers" accused of using excessive force.[27] We held that an officer is entitled to qualified immunity if the officer's conduct was an objectively reasonable use of force or the officer reasonably believed that the conduct was lawful.[28] We have explained that "[t]his test recognizes that there may be behavior that is objectively unreasonable but that nonetheless an officer might have reasonably believed *was* reasonable. If this is the case, then the officer should be entitled to qualified immunity for his behavior." [29] Under the second part of the inquiry, the reasonableness of an officer's belief that his conduct was lawful depends on whether a reasonable officer would have been "on notice" that his particular use of force would be unlawful.[30] An officer may be on notice that his particular use of force was unlawful either because closely analogous cases, laws, or regulations suggest that the conduct is unlawful, or because the conduct was so egregious that any reasonable officer would have known that it

---

"objective reasonableness" test in an excessive force case brought under state law).

**20.** *Samaniego,* 2 P.3d at 83 (defining "discretionary" actions as "those that require personal deliberation, decision and judgment"); *accord Saucier v. Katz,* 533 U.S. 194, 203, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (noting that "qualified immunity applie[s] in the Fourth Amendment context just as it would for any other claim of official misconduct"), *overruled in part by Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

**21.** *Sheldon,* 178 P.3d at 463.

**22.** 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

**23.** *Id.* at 200, 121 S.Ct. 2151.

**24.** *Id.* at 200, 121 S.Ct. 2151 (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)).

**25.** *Id.* at 201–02, 121 S.Ct. 2151; *see also id.* at 205, 121 S.Ct. 2151 (describing the inquiries as the "reasonableness of the officer's belief as to

the appropriate level of force" and whether the officer made a "reasonable mistake[ ] ... as to the legal constraints on particular police conduct").

**26.** *Pearson,* 129 S.Ct. at 818.

**27.** *Sheldon,* 178 P.3d at 463.

**28.** *Id.* at 463–64 ("[T]he United States Supreme Court emphasized that in deciding whether an officer is eligible for qualified immunity one must not merely look to whether an officer's actions were objectively reasonable, but also to whether the officer might have *reasonably believed* that his actions were reasonable.") (citing *Saucier,* 533 U.S. at 205, 121 S.Ct. 2151); *see also Olson v. City of Hooper Bay,* 251 P.3d 1024, 1031 (Alaska 2011).

**29.** *Sheldon,* 178 P.3d at 463.

**30.** *Id.* at 463 (citing *Saucier,* 533 U.S. at 202, 121 S.Ct. 2151).

was unlawful.[31]

In considering whether an officer could have reasonably believed that his conduct was lawful because he was not on notice that his particular use of force was excessive, we have directed trial courts to "look to our own jurisdiction and other jurisdictions to see if there are any cases, laws, or regulations which would suggest that the type of action taken by the officer is considered unlawful."[32] We explained in *Sheldon* that these cases, laws, and regulations must be relevant to "specific actions taken in specific circumstances,"[33] following the United States Supreme Court's direction in *Saucier* that the question whether a reasonable officer would have been on notice that his conduct was unlawful "must be undertaken in light of the specific context of the case, not as a broad general proposition."[34] But we cautioned in *Sheldon* against extremes, directing that trial courts should neither rely solely on the broad, general use of force statutes nor require that prior case law, statutes, or regulations discuss the appropriate use of force in an identical factual scenario.[35] We recognized that trial courts should not "go[ ] too far" by determining that "each situation, in its particularity, could not have been anticipated by any law or regulation, so an officer could never be on notice that *this* use of force in *this* set of circumstances could be unlawful."[36]

██ We added in *Sheldon* that some conduct is "so egregious, so excessive" that any reasonable officer would have known that it was unlawful even in the absence of closely analogous case law.[37] Cautioning that "[o]ne should not let the lack of explicit law in an area be a substitute for the reasonable officer's common sense," we explained that some conduct is so "shocking" that "the nature of the act [gives] sufficient warning that [the conduct is] excessive."[38] Federal courts have agreed that certain conduct is "so egregious that any reasonable person would have recognized a constitutional violation"[39] and that "even if there is no closely analogous case law, a right can be clearly established on the basis of common sense."[40] As stated by the Seventh Circuit Court of Appeals, qualified immunity should be denied even "without identifying a closely analogous case if . . . the force used was so plainly excessive that the police officers should have been on notice that they were violating the Fourth Amendment" because "police officers should not be shielded from liability just because their excessive use of force happens to be original."[41]

31. *See id.* at 463, 465–67.

32. *Id.* at 466.

33. *Id.* at 466 (citing *Brosseau v. Haugen*, 543 U.S. 194, 199–200, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004)).

34. *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151; *see also Ashcroft v. Al–Kidd,* —— U.S. ——, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011) (describing the required case law necessary to put a government official on notice that particular conduct is unlawful as either "controlling authority" or "a robust consensus of cases of persuasive authority") (internal quotation marks omitted).

35. *Sheldon*, 178 P.3d at 466; *see also Olson v. City of Hooper Bay*, 251 P.3d 1024, 1037 (Alaska 2011) ("General excessive force statutes are insufficient to provide this notice; cases that deal with the specific actions taken by police officers are persuasive.").

36. *Sheldon*, 178 P.3d at 466; *see also Hope v. Pelzer*, 536 U.S. 730, 739–41, 743–44, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (explaining that officials may be on notice that their conduct violates established law even in novel factual circumstances and that a relevant prior decision may provide adequate notice not only with its holding, but also by its reasoning, or when the "premise" of the case "has clear applicability" to a subsequent set of facts).

37. *Sheldon*, 178 P.3d at 467; *see also Olson*, 251 P.3d at 1040–41 (concluding that it was plain error for a superior court not to address "whether the nature of the officers' actions, alone, provides notice that the force they used became excessive at some point in the sequence of events").

38. *Sheldon*, 178 P.3d at 467.

39. *Backlund v. Barnhart*, 778 F.2d 1386, 1390 (9th Cir.1985).

40. *Giebel v. Sylvester*, 244 F.3d 1182, 1189 (9th Cir.2001) (internal quotation marks omitted).

41. *Rice v. Burks*, 999 F.2d 1172, 1174 (7th Cir. 1993) (internal citations omitted).

## B. Officer Virg–In Is Not Entitled To Qualified Immunity On Summary Judgment.

J.N.'s primary argument on appeal is that the superior court erroneously granted qualified immunity to Officer Virg–In on summary judgment. J.N. emphasizes that the superior court found triable issues of fact that would preclude summary judgment on the question whether Officer Virg–In acted reasonably during the taser incident. She contends that it was error for the superior court to grant Officer Virg–In qualified immunity both because existing law would have put Officer Virg–In on notice that his use of force was excessive and because his conduct was "so egregious that it would eliminate the need for clearly established law." Officer Virg–In defends the superior court's grant of qualified immunity, citing the "silence" in the case law prior to July 2003 and maintaining that "no cognizable legal precedent prior to July 29, 2003[ ] would have put [him] on notice that the use of a [t]aser in this situation was prohibited, unlawful conduct for a police officer."

We have recognized the desirability of determining an officer's entitlement to qualified immunity early in a case, such as on summary judgment.[42] In some cases, however, disputed material facts will prevent summary judgment on qualified immunity grounds be-cause a fact-finder must resolve these disputed facts.[43] We conclude that this is such a case. The superior court's summary grant of qualified immunity cannot stand because an officer's multiple uses of a taser on a non-threatening, compliant, 11–year–old girl suspected of traffic violations could be so egregious, such an obvious violation, that any reasonable officer would have known that the conduct was unlawful.[44] Here, there is a factual dispute whether, among other things, J.N. was fully compliant and had completely ceased her efforts to flee. This, and perhaps other disputed material facts, must be resolved at trial before the egregiousness of Officer Virg–In's conduct and his entitlement to qualified immunity can be determined.

### 1. As of July 2003, there was no law specifically governing the use of tasers in these circumstances that was sufficient to put Officer Virg–In on notice that his conduct was unlawful.

J.N. urges that the lawful use of tasers was clearly established by July 2003 such that Officer Virg–In reasonably should have known that his conduct was unlawful. J.N. asserts that pre–2003 case law from other jurisdictions, although not specifically addressing tasers, established that "it was unlawful to use force on an individual who was being compliant and no longer resisting the officer." [45]

---

42. *Crawford v. Kemp*, 139 P.3d 1249, 1255 n. 11 (Alaska 2006) (stating that "ordinarily immunity questions should be decided long before trial" because "[o]fficial immunity shelters the state and government officials from all aspects of a lawsuit . . .; it is not solely a shelter from liability").

We have explained, however, that a defendant may "be deemed immune at the conclusion of trial" even where the defendant is not entitled to qualified immunity in a preliminary proceeding; at the trial immunity serves as a "mere defense to liability." *Olson*, 251 P.3d at 1031 n. 24 (citing *Acevedo–Garcia v. Monroig*, 351 F.3d 547, 562 n. 6 (1st Cir.2003)); *see also Ortiz v. Jordan*, —— U.S. ——, 131 S.Ct. 884, 889, 178 L.Ed.2d 703 (2011) ("A qualified immunity defense, of course, does not vanish when a [ ] court declines to rule on the plea summarily. The plea remains available to the defending officials at trial; but at that stage, the defense must be evaluated in light of the character and quality of the evidence received in court.").

43. *See Crawford*, 139 P.3d at 1256, 1258 ("Although we recognize the policy in favor of decid-ing immunity issues prior to trial in order to insulate officers from claims based on reasonable mistakes . . . . [w]hether a reasonable officer could have believed that the arrest was lawful depends on the resolution of factual disputes as to what transpired."); *see also Curley v. Klem*, 499 F.3d 199, 208 (3d Cir.2007) (acknowledging that "the Supreme Court has instructed that immunity ordinarily should be decided by the court long before trial" and agreeing "[t]hat is well and good when there are no factual issues in a case" but explaining that "often the facts are intensely disputed, and . . . such disputes must be resolved by a jury after a trial").

44. Our decision does not preclude the availability of qualified immunity at some later stage in this litigation. *See supra* note 42.

45. In her opposition to summary judgment, J.N. brought to the attention of the superior court only one pre–2003 case related to the use of tasers. *See Russo v. City of Cincinnati*, 953 F.2d 1036, 1044–45 (6th Cir.1992) (finding that the

We conclude that as of July 2003 there was no closely analogous case law specifically regarding the use of tasers under these circumstances that was sufficient to put Officer Virg–In on notice that his conduct was unlawful. Here, as in *Sheldon,* "the lack of evidence from other jurisdictions that [the type of force at issue] would be unlawful is telling." [46] As the Ninth Circuit Court of Appeals recently observed, "[t]he [t]aser is a relatively new implement of force, and case law related to the [t]aser is developing." [47] In that case, the circuit court granted qualified immunity to an officer who used a taser to arrest a 21–year–old suspected of a seatbelt violation who was clearly unarmed, was not threatening, and did not attempt to flee, despite holding that the officer used unconstitutionally excessive force. [48] Similarly, in *Olson v. City of Hooper Bay,* we recently affirmed the trial court's decision that existing case law addressing the use of tasers in December 2006 did not provide officers with notice that their multiple uses of a taser was excessive force, rejecting arguments that an unpublished summary judgment order, several unreported cases from outside of Alaska, or published case law on other types of force could provide the necessary notice. [49]

■■■ We recognize that there was not a complete dearth of case law on the use of tasers as of July 2003. As J.N. points out in her reply brief, our 2000 decision in *Samaniego v. City of Kodiak* involved an excessive force claim and the use of a "stun gun." [50]

J.N. urges that as a result of this case, "the law in Alaska was clearly established as of July 2003." In *Samaniego,* officers applied a "stun gun" five times to a female arrestee's neck after she had been at least partially handcuffed; the officers also threw her against a car, causing her to strike her head on it, and brought her to the ground and kneeled on her back and neck. [51] We summarized that (1) the arrestee had committed only minor crimes of disorderly conduct and resisting arrest; (2) she put up some resistance to arrest, but did not strike the officers or flee; and (3) there was no immediate threat to the officer's safety. [52] Under these circumstances, we determined that a reasonable jury could have found that the officer's use of force was excessive. [53] But because we evaluated the claim of excessive force as comprising the totality of the officer's actions, which included multiple uses of other force besides a "stun gun," *Samaniego* standing alone was insufficient to provide notice to Officer Virg–In that using a taser twice on J.N. was unlawful. [54]

**2. Disputed material facts preclude a summary judgment determination on the question whether Officer Virg–In's conduct was so egregious that any reasonable officer would have known that it was an unlawful use of force.**

■■■ In some situations qualified immunity should be denied because the officer's

---

use of a taser on a person holding knives and threatening to kill himself and officers was reasonable).

**46.** *Sheldon v. City of Ambler,* 178 P.3d 459, 466–67 (Alaska 2008) (finding it "persuasive" that "there is no clear case or law or regulation from Alaska, or from anywhere else," saying that the officer's alleged conduct in the circumstances was excessive force).

**47.** *Bryan v. MacPherson,* 630 F.3d 805, 833 (9th Cir.2010) (quoting *Brown v. City of Golden Valley,* 574 F.3d 491, 498 n. 5 (8th Cir.2009) and adding that two other Ninth Circuit panels have recently "concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity").

**48.** *Id.* at 832–33.

**49.** 251 P.3d 1024, 1037–39 (Alaska 2011) (adding that both the plaintiff and the defendants "acknowledge that there was a lack of published case law on the objective reasonableness of taser usage prior to December 26, 2006" and agreeing with the superior court that "jurisprudence on claims of excessive force involving [t]asers was either unclear or nonexistent at the time of [plaintiff's] arrest") (internal quotation marks omitted).

**50.** 2 P.3d 78 (Alaska 2000).

**51.** *Id.* at 81–82.

**52.** *Id.* at 86.

**53.** *Id.* at 86–87.

**54.** *See Olson,* 251 P.3d at 1039.

particular use of force was so egregious, such an obvious violation, that any reasonable officer would have known that the conduct was unlawful.[55] The superior court acknowledged this aspect of the qualified immunity analysis but found that Officer Virg–In's conduct was "not so egregious or lacking in common sense that he would have known [that it was] excessive even without the guidance of prior law." As stated by the superior court, when factual inferences are made in J.N.'s favor, "Officer Virg–In approached and used a [t]aser twice on an 11 year-old girl [ ] who had already been stopped ... had ceased her earlier extensive efforts to escape ... and [ ] had not used aggressive or threatening behavior in her attempt to escape arrest." And it is undisputed that Officer Virg–In's second use of the taser in "direct contact stun mode" occurred when he had J.N. in hand—he was holding on to J.N.'s elbow as he tased her.[56] Based on these facts, J.N. counters that "no authority is required to show that the use of a [t]aser on a 1[1]-year-old girl who was no longer resisting, was excessive and unnecessary" and that "the exceptional circumstances of this case, which are the gratuitous use of force on a

child, eliminates the need for prior, clearly established law."

Federal courts have found a variety of conduct sufficiently egregious and excessive to preclude qualified immunity even without closely analogous case law.[57] Most relevant here is a 2006 case from the Eleventh Circuit Court of Appeals denying qualified immunity for an officer who handcuffed a nine-year-old girl who had initially disobeyed and verbally threatened to hit a teacher but then complied with the teacher's orders.[58] The circuit court reasoned that because the girl was not threatening the teacher or the officer, the act of handcuffing was "an attempt to punish" the girl and was "excessively intrusive given [the girl's] young age and the fact that it was not done to protect anyone's safety."[59] The Eleventh Circuit stated that "[e]ven in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious"[60] and concluded that the officer's "conduct in handcuffing [ ] a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of [her] Fourth Amendment rights."[61] In another case involving a child, the Seventh Circuit Court of Appeals held that, even in

**55.** *See supra* Part IV.A.

**56.** When an officer uses multiple applications of nondeadly force and the question of excessive force turns on the number of times force is applied, a court may consider each sequential application of force. *Olson*, 251 P.3d at 1036 (citing *Beaver v. City of Federal Way*, 507 F.Supp.2d 1137, 1144–45 (W.D.Wash.2007)). Or, a court may evaluate all applications of force together to determine "whether the entirety of the force used was reasonable." *Samaniego*, 2 P.3d at 85–86.

**57.** *E.g., Hope v. Pelzer*, 536 U.S. 730, 738, 745, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (handcuffing a prisoner to a hitching post for seven hours without water or bathroom breaks); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 60–61 (1st Cir.2008) (beating and pepper-spraying non-threatening people to force them to exit a private area); *Jones v. City of Cincinnati*, 521 F.3d 555, 559–60 (6th Cir.2008) (striking an unresisting suspect with a baton, putting pressure on his back, and using chemical irritants); *Jennings v. Jones*, 499 F.3d 2, 16–17 (1st Cir.2007) (increasing force to the point of breaking an arrestees's ankle after the arrestee had been forcibly restrained and had stopped resisting arrest); *Motley v. Parks*, 432 F.3d 1072,

1088–89 (9th Cir.2005) (en banc) (holding an infant at gunpoint); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1061–62 (9th Cir.2003) (kneeling on the back and neck of a compliant detainee after he complained that he was choking); *Lee v. Ferraro*, 284 F.3d 1188, 1198–99 (11th Cir.2002) (slamming an arrestee's head against the trunk of a car after arrestee was handcuffed); *Priester v. City of Riviera Beach*, 208 F.3d 919, 926–27 (11th Cir.2000) (allowing (or ordering) a dog to attack a non-resisting arrestee).

**58.** *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295, 1306–08 (11th Cir.2006).

**59.** *Id.* at 1306.

**60.** *Id.* at 1306–07 (citing *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

**61.** *Id.* at 1307; *see also C.B. v. Sonora Sch. Dist.*, 691 F.Supp.2d 1170, 1184 (E.D.Cal.2010) (refusing to grant qualified immunity to officer who handcuffed a disabled student who had been disruptive but posed no danger to anyone and was no longer acting out of control when the officer arrived).

the absence of a factually similar case, an officer was not entitled to qualified immunity where he held a gun to the head of a nine-year-old child and threatened to pull the trigger when the child was not resisting arrest or trying to flee.[62]

 Moreover, although we acknowledge that in July 2003 there was no case law specifically addressing the use of tasers sufficient to put Officer Virg–In on notice that his conduct was unlawful, other general principles regarding appropriate force certainly existed.[63] As the United States Supreme Court has explained, while "the general proposition that use of force is [unconstitutional]

if it is excessive under objective standards of reasonableness" is normally "not enough," [64] in an "obvious case" this principle alone can give an officer notice that a particular use of force is excessive.[65] There is no question that there is (and was in 2003) a clearly established right to be free from excessive force during arrest.[66] Moreover, the use of force is least justified against nonviolent misdemeanants who are not fleeing or actively resisting arrest [67] and who do not "pose[ ] an immediate threat to the safety of the officers or others." [68] And as the Ninth Circuit Court of Appeals explained in 2001, "[w]here there is no need for force, *any* force used is

---

62. *McDonald v. Haskins*, 966 F.2d 292, 293–95 (7th Cir.1992) (elaborating that the fact that the boy was not under arrest, that the officer threatened to pull the gun's trigger, and that the boy was "only nine years old," were "the very ingredients relevant to an excessive force inquiry" and concluding that "[i]t should have been obvious to [the officer] that his threat of deadly force ... was objectively unreasonable given ... the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat.").

63. While not available to inform Officer Virg–In's conduct, post–2003 excessive force cases involving tasers rely on these same principles to evaluate when an officer's use of a taser is reasonable. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir.2010) (stating that the most important issue in determining whether taser use is excessive force is whether the suspect was an "immediate threat to the safety of the officers or others"); *Kijowski v. City of Niles*, 372 Fed.Appx. 595, 601 (6th Cir.2010) (unpublished) (holding that "the right to be free from physical force when one is not resisting the police is a clearly established right" and "[a]gainst the backdrop of existing law, [the officer] could not reasonably have believed that use of a [t]aser on a non-resistant subject was lawful"); *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665–67 (10th Cir.2010) (denying an officer qualified immunity and holding that it was "clearly established" that the officer "could not use his [t]aser on a non-violent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning"); *Brown v. City of Golden Valley*, 574 F.3d 491, 493, 499 (8th Cir.2009) (holding that the law was sufficiently clear as of October 2005 to inform a reasonable officer "that it was unlawful to [t]aser a nonviolent, suspected misdemeanant who was not fleeing or resisting arrest, who posed little to no threat to anyone's safety, and whose only noncompliance with the officer's commands was to disobey two orders to end her phone call to a 911 operator"); *Azevedo v. City of Fresno*, No. 1:09–CV–375 AWI

DLB, 2011 WL 284637, at *9 (E.D.Cal. Jan. 25, 2011) ("Given the nature of the use of force, something more than nonviolent misdemeanors must be at play to justify its use. While Azevedo was clearly in flight when [the officer] deployed the taser, the Court cannot say as a matter of law that Azevedo's flight made use of the taser reasonable."); *Odom v. Matteo*, 772 F.Supp.2d 377, 391 (D.Conn.2011) ("In sum, the use of a [t]aser is a significant use of force, and a reasonable jury could well find that its repeated deployment on an individual who is suspected of only minor traffic infractions, poses no immediate threat, is not attempting to escape, and has indicated that she suffers from a brain injury constitutes an excessive and unreasonable use of force."). *But see Draper v. Reynolds*, 369 F.3d 1270, 1277–78 (11th Cir.2004) (deciding that the single tasering of an arrestee after a traffic stop was "reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced ... [the arrestee] was hostile, belligerent, and uncooperative").

64. *Brosseau v. Haugen*, 543 U.S. 194, 198–99, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004).

65. *Id.* at 199, 125 S.Ct. 596; *see also Hope v. Pelzer*, 536 U.S. 730, 740–41, 745–46, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (reasoning that "general statements of the law are not inherently incapable of giving fair and clear warning" and adding that the "obvious cruelty inherent" in the practice of tying a prisoner to a post "should have provided respondents with some notice" that the conduct was an Eighth Amendment violation).

66. *See Saucier v. Katz*, 533 U.S. 194, 201–02, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

67. *See Graham v. Connor*, 490 U.S. 386, 395–96, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

68. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994).

constitutionally unreasonable." [69] Finally, J.N.'s young age contributes to the unreasonableness of Officer Virg–In's conduct, especially because tasers may cause increased harm to children.[70] We agree with Officer Virg–In and the City that post–2003 cases indicate that the use of a taser on a juvenile is not *always* an excessive use of force, but these cases do not support that an officer may use a taser on an 11–year–old girl charged with a traffic offense who is not resisting arrest and does not present a threat to the officers.[71]

We recognize that there are factual disputes regarding whether, for example, J.N. was fully non-resistant and compliant before Officer Virg–In first deployed the taser's probes. J.N. testified that she "stopped right away" after she was grabbed by another teenager on the street and was "face to face" with Officer Virg–In, "wait[ing] for him" when he first used his taser. Multiple uses of a taser on a non-threatening 11–year–old girl suspected of traffic violations, who was no longer resisting or attempting to flee, could be sufficiently egregious to put any reasonable officer on notice that the conduct was unlawful. Thus, the superior court's grant of qualified immunity on summary judgment cannot stand and the relevant disputed facts must be resolved at trial.

## C. The City Of Kotzebue Is Not Entitled To Summary Judgment.

■ The superior court granted the City's summary judgment motion, dismissing J.N.'s claims for improper and negligent training or supervision, "based on [Officer Virg–In's] qualified immunity" and "the lack of a constitutional violation." We agree with the superior court that to the extent that J.N. sought to hold the City jointly and severally liable for Officer Virg–In's conduct, the City would be entitled to statutory immunity under Alaska law predicated on a determination that Officer Virg–In has qualified immunity.[72] Because we reverse the summary judgment grant of qualified immunity

**69.** *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir.2001) (quotation marks omitted).

**70.** J.N. attached to her opposition to summary judgment a paper from the International Association of Chiefs of Police National Law Enforcement Policy Center, originally published in 1996, which notes that the model policy on tasers "includes in the population of 'susceptible' individuals ... children ... and persons of small stature, regardless of age." For such "susceptible" persons, "[a]dded caution may be warranted when using [tasers] ... just as added caution would normally be recommended when using OC [pepper] spray or similar nondeadly force weapons."

**71.** *See RT v. Cincinnati Pub. Sch.*, No. 1:05cv605, 2006 WL 3833519, at *2 (S.D.Ohio Dec. 29, 2006) (finding use of a taser not excessive where a minor was kicking, screaming, jerking, biting and otherwise resisting arrest and was warned before being tased a single time); *N.A. ex rel. Ainsworth v. Inabinett*, No. 2:05–CV–740 DRB, 2006 WL 2709850, at *1, 5–6 (M.D.Ala. Sept. 20, 2006) (determining that using a taser one time to subdue a mentally unstable, suicidal, and otherwise violent and threatening 16–year–old minor after attempting alternative means and giving a warning was not excessive); *Maiorano ex rel. Maiorano v. Santiago*, No. 6:05–cv–107–Orl–19KRS, 2006 WL 2024951, at *2, 10 (M.D.Fla. July 15, 2006) (concluding that using a taser on fighting high school students in a school with suspected gang-related violence and possible weapons was not excessive); *Johnson v. City of Lincoln Park*, 434 F.Supp.2d 467, 469–70, 479–

80 (E.D.Mich.2006) (finding it not excessive to taser a 14–year–old minor who was handcuffed but still resisting arrest, including trying to head butt and bite the officer, where the officer gave a warning and did not use the taser after the minor stopped struggling). *But see Michaels v. City of Vermillion*, 539 F.Supp.2d 975, 977–79, 989–90 (N.D.Ohio 2008) (holding that an officer was not entitled to qualified immunity from claims that he used a taser 25 times after placing a 17–year–old arrestee accused of vandalism in handcuffs and stating that "the right of people who pose no safety risk to the police to be free from gratuitous violence during arrest" was clearly established).

**72.** *See Estate of Logusak v. City of Togiak*, 185 P.3d 103, 109–10 (Alaska 2008) (holding that because city police officers "acted reasonably in performing [a] discretionary act" the city was "immune under discretionary function official immunity"); *Sheldon v. City of Ambler*, 178 P.3d 459, 461 (Alaska 2008) (equating the officer and the city for purposes of entitlement to qualified immunity when plaintiff sued both for excessive force in violation of Alaska statutes); *see also Pauley v. Anchorage Sch. Dist.*, 31 P.3d 1284, 1285–86 (Alaska 2001) (granting qualified immunity to a school district after the school principal released a child to a non-custodial parent because the principal's act was discretionary and entitled to qualified immunity). Nor would the City have been liable on a respondeat superior theory had J.N. argued a § 1983 claim, though the City may have been directly liable if it inflicted a constitutional injury. *See Hildebrandt v. City of Fairbanks (Hildebrandt II )*, 957 P.2d 974,

to Officer Virg–In, dismissal of the City from a claim of joint and several liability must be reversed as well.

 However, J.N.'s claim of improper and negligent training or supervision, lodged solely against the City, should not have been dismissed because it is a separate claim charging the City with direct liability.[73] As counsel for the City explained, "the claim against the city is a claim for improper and negligent supervision and training. This is a direct liability claim."[74] Officer Virg–In's entitlement to qualified immunity would not provide the City with any type of "derivative" immunity from this separate, direct-liability claim.[75]

Finally, because it may affect the proceedings on remand, we wish to clarify that it is incorrect to equate a grant of qualified immunity with a finding of no constitutional violation. In *City of Los Angeles v. Heller*, the United States Supreme Court explained that finding in favor of an officer sued for excessive force "was conclusive not only as

to [the officer], but also as to the city," reasoning that "if the [officer] inflicted no constitutional injury on respondent, it is inconceivable that [the city] could be liable to respondent."[76] But a careful distinction must be drawn between situations where an officer is found not liable because the conduct was not a constitutional violation and where an officer is granted immunity because it was reasonable for the officer to believe that his or her conduct was lawful.[77] As summarized by one treatise:

> [T]he fact that a defendant official is found to be protected from personal liability by qualified immunity because she did not violate clearly established federal law does not protect the municipality from liability.... On the other hand, if the court finds that the individual officer is protected by qualified immunity because she did not violate plaintiff's federal right, this determination may lead to dismissal of the municipal liability claim.[78]

 Here, the superior court determined that there were issues of material fact

---

977 (Alaska 1998) ("A municipality may be directly responsible under § 1983 when an employee executes a governmental policy or custom that inflicts constitutional injury.") (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018 (holding that "Congress *did* intend municipalities ... to be included among those persons to whom § 1983 applies" but that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory").

73. Again, it is unclear whether J.N. intended to plead a federal constitutional claim against the City. *See supra* note 5 and accompanying text.

74. Counsel for the City added, "[T]here [are] really two defendants and there are two issues that have been raised by the pleadings filed by the defendants. First is the issue of qualified immunity for Officer Virg–In, and second is the issue of summary judgment for the City of Kotzebue on the separate issue of training and supervision."

75. *See Sheldon*, 178 P.3d at 467 (addressing plaintiff's state law failure to train claim against the city even after affirming a grant of qualified immunity to the officer, though not reaching the merits of the claim because the claim was waived); *Prentzel v. State, Dep't of Pub. Safety (Prentzel II )*, 169 P.3d 573, 589–91 (Alaska 2007) (concluding that officers were entitled to statutory and common law qualified immunity on plain-

tiff's state law and § 1983 claims but still considering plaintiff's § 1983 and state law negligence claim against supervisors and the State for failure to train).

Nor is the City likely entitled to statutory immunity on its own behalf under AS 09.65.070(d). Statutory immunity is available to municipalities for their "discretionary" acts, but the City does not have "discretion" to act negligently in training its officers. *See Guerrero ex rel. Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 976 (Alaska 2005) (clarifying that "[o]nce the state has made a planning-level decision to undertake a project, it does not have discretion to implement that decision negligently").

In a § 1983 action, municipalities are simply not entitled to qualified immunity under federal law. *Owen v. City of Independence*, 445 U.S. 622, 650, 657, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980) (rejecting "a construction of § 1983 that would accord municipalities a qualified immunity for their good-faith constitutional violations").

76. 475 U.S. 796, 798–99, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

77. As we have stated, "a reasonable but mistaken belief can confer immunity on an officer *even after* it has been established that the officer violated a constitutional right by behaving unreasonably." *Sheldon*, 178 P.3d at 463.

78. 1A Martin A. Schwartz, Section 1983 Litigation Claims and Defenses § 7.13[A] (4th ed. 2003).

regarding whether Officer Virg–In's conduct was an excessive use of force. Thus, even if Officer Virg–In is found to be entitled to qualified immunity because he could have reasonably believed that his conduct was lawful, the City may still be liable on a failure to train claim.[79]

Because the City was not entitled to immunity, we remand to the superior court to determine whether the City is entitled to summary judgment on the merits of J.N.'s negligent training and supervision claim.[80]

## D. Attorney's Fees and Costs

 Because we reverse the grants of summary judgment to Officer Virg–In and the City of Kotzebue the attorney's fees and costs award is vacated. We note, however, that the provisions applicable to any attorney's fees or costs award in this case, where

Russell brought the action on behalf of her minor child as the child's guardian,[81] are Alaska Civil Rule 17(c)[82] and AS 09.60.030.[83]

## V. CONCLUSION

We REVERSE the superior court's summary judgment grant of qualified immunity to Officer Virg–In and REMAND for proceedings consistent with this opinion. We REVERSE the superior court's grant of summary judgment dismissing J.N.'s claims against the City of Kotzebue and REMAND for proceedings consistent with this opinion. We VACATE the attorney's fees and costs award.

CHRISTEN, Justice, not participating.

---

79. Moreover, a determination that an officer's conduct was not a constitutional violation will relieve a municipality from liability only in a suit under 42 U.S.C. § 1983. *Hildebrandt v. City of Fairbanks (Hildebrandt II)*, 957 P.2d 974, 977–78 (Alaska 1998) ("[J]oin[ing] the majority of the Courts of Appeals" and holding that "a 42 U.S.C. § 1983 claim based on a municipality's failure to train requires an underlying violation of constitutional rights."); *see also City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (deciding that a city may be liable under § 1983 for "constitutional violations resulting from its failure to train municipal employees"); *Simmons v. Navajo Cnty.*, 609 F.3d 1011, 1021 (9th Cir.2010) ("Because we hold that there was no underlying constitutional violation, [plaintiff] cannot maintain a claim for municipal liability."). A federal constitutional violation is not a necessary element of a state law negligence claim for failure to train. *See Prentzel II*, 169 P.3d at 588–89 (evaluating the merits of plaintiff's state law negligent training and supervision claims after finding that the officer's conduct did not violate the Fourth Amendment); *Hildebrandt II*, 957 P.2d at 976 (dismissing plaintiff's 42 U.S.C. § 1983 failure to train claim because there was no constitutional violation by the officer but not disturbing the superior court's verdict holding the city liable pursuant to plaintiff's state law negligence claim).

80. The superior court stated: "[T]here would be a triable issue of fact as to the adequacy of training and supervision of Kotzebue police officers as to the use of [t]asers. But for the qualified immunity, this issue would result in denial of the defendants' motion for summary judgment on these claims." But because the superior

court did not grant or deny the City's motion for summary judgment on the merits, we cannot consider the merits of the claim.

81. AS 09.15.010, which creates a separate, independent parental cause of action, does not apply here because it accounts for parents' losses resulting from injury or death to their child. *Gillispie v. Beta Const. Co.*, 842 P.2d 1272, 1273 (Alaska 1992); *see id.* at 1273–74 (noting that the predecessor statute to AS 09.15.010 was "interpreted as pertaining to pecuniary loss of the parent," and concluding that AS 09.15.010 is "the appropriate vehicle for recognizing [parents' mental and emotional] loss" resulting from the death of their child). Russell did not assert any claims on her own behalf in this matter and so does not incur liability for attorney's fees and costs as a plaintiff.

82. Alaska Rule of Civil Procedure 17(c) provides in relevant part: "Whenever an infant or incompetent person has a representative, such as a general guardian, committee, conservator, or other like fiduciary, the representative may sue or defend on behalf of the infant or incompetent person. An infant or incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem."

83. AS 09.60.030 provides: "When costs or disbursements are adjudged against an infant plaintiff or incompetent, the guardian by whom the plaintiff appeared in the action is responsible for the payment, and payment may be enforced against the guardian as if the guardian were the actual plaintiff."